[Crim. No. 12567.   Second Dist., Div. One.   Apr. 19, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. FRED CHARLES WALKER, Defendant and Appellant.

Donald M. Rosenstock for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Richard Tanzer, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is a purported appeal by defendant from "the conviction and sentence" in a case involving the posses-

sion for sale of a dangerous drug, amphetamine sulphate. We shall consider the matter as an appeal from the order granting probation.

In an information filed in Los Angeles County on January 3, 1966, defendant was charged with possessing for sale on December 2, 1965, a dangerous drug in violation of section 11911, Health and Safety Code. Defendant pleaded not guilty and pursuant to stipulation the cause was submitted upon the testimony contained in the transcript of the proceedings had at the preliminary hearing and the exhibits received in evidence at the preliminary hearing subject to the court's rulings and the right to offer additional evidence. Defendant was found guilty as charged, proceedings were suspended and probation was granted for five years, a part of the terms being that defendant spend the first 360 days in the county jail. A motion for a stay of execution was denied. The notice of appeal was timely filed.

On December 1, 1965, Officer Penn Weldon submitted an affidavit in support of and a petition for a search warrant to the magistrate in the Municipal Court of El Monte Judicial District in Los Angeles County.[1]

[1]The affidavit in question sets forth, among other things, that there was in the possession of Fred Walker, on the named and described premises which he occupied in El Monte certain "narcotics consisting of dangerous drugs, heroin and marijuana, together with a paraphernalia instrumental in the use of said contraband." Further, it is set forth that the affiant was a deputy sheriff of Los Angeles County of eight years' experience, with the last six years thereof, and at present, on the narcotics detail where he became and is familiar with the methods used in the illegal traffic of narcotics in the county; that he had known Walker for three months and had received information from various persons that Walker was engaged in the sale of large quantities of dangerous drugs; that he had received information from a fellow officer that on one occasion an undercover officer of the sheriff's office had purchased dangerous drugs from a person who went to the Walker location at 9829 Cortada Street in El Monte to get said drugs; that on November 30, 1965, affiant received information from a confidential, reliant informant that during the week of November 22, 1965, he, the informant, had been to Walker's house and had seen numerous paper bags containing large quantities of dangerous drugs. That the informant told affiant that Walker had told him that he was going to purchase 25 more "jars of whites" on the weekend of November 27, 1965. That to affiant the term, or words, used referred to amphetamine; that the informant told affiant the pills were in the bedroom area of the house. Further, that the informant on two prior occasions had given information which resulted in the arrest of five persons on narcotics charges, two of whom were convicted and the remainder of whom were still awaiting court hearing. Affiant desired to keep the name of the informant confidential because to do otherwise would be detrimental to the informant's safety. Affiant checked the electric utility company on November 30, 1965, and ascertained that electricity was supplied to the house heretofore mentioned and that the account therefor was in the name of Walker. Further, that the informant

On December 2, 1965, at about 6 p.m. Officer Weldon with Officer Guenther, pursuant to the search warrant, conducted a search of 9829 Cortada, El Monte, and in a closet of a bedroom Weldon found a box containing seven bags, each bag contained about 1,000 white double-scored tablets which were found to be amphetamine sulphate. In a closet of the same bedroom, Weldon found a shoe box which contained about 4,000 white tablets which were found to be amphetamine sulphate and further found two large brown bottles containing at least 50 amphetamine sulphate tablets, a white envelope containing amphetamine sulphate and a brown bag containing four plastic vials, each of which contained amphetamine sulphate. Guenther asked defendant if he had a prescription for the pills and defendant replied in the negative and he was then placed under arrest. Guenther then advised defendant that he had a right to an attorney at all proceedings, that he need not say anything, that he had a right to remain silent and that anything he said might be used against him. Defendant responded by saying, ''I understand that.'' Defendant was then asked if there were any more pills in the house and defendant replied, ''Yes, right there.'' and pointed to a box. He was also asked why the pills were rolled and he replied that he had been sick at home with nothing to do and that he had rolled the pills so he could sell them by the roll. Inquiry was made as to whether there were more pills in the house and defendant stated that as far as he knew that was all of them.

At about 7:30 p.m. of the same day, at an interrogation room, defendant was again advised of his rights, that anything he said could be used against him, that he could remain silent and that he could have an attorney at all proceedings. Weldon then inquired of defendant where he had obtained the pills and defendant replied, ''No. I don't want to tell you

had advised affiant that Walker used a late model white pickup truck and a white Ford Mustang car to transport narcotics; that Walker frequently was away from the house during the daytime and that he, Walker, frequently took the named narcotics and drugs with him. Affiant further stated that it was his opinion that it was more likely that the drugs and narcotics would be found on the premises during the nighttime. Affiant then stated, based upon the facts and circumstances related, that he had reasonable cause to believe that grounds for the issuance of a search warrant existed and that a search warrant should be issued for the seizure of the property at any time of the day or night, and that the same should be brought before the magistrate.

The search warrant was issued for ''narcotics consisting of dangerous drugs, heroin and marijuana, together with a paraphernalia instrumental in the use of said contraband'' at the address of Walker in El Monte.

until I have talked to my attorney." He then stated, in response to questions, that he had the pills for about three weeks, and that the pills found in the box were rolled by him to sell to truck drivers. Twice defendant stated that before he answered a particular question he would want to see an attorney. Defendant was given an opportunity to explain that the pills were not in his possession before the arrest was made.

Appellant now asserts that the search warrant was improperly issued for the reasons that the facts set forth in the affidavit were insufficient to support a finding of probable cause to issue the warrant, that it was improper to issue a nighttime warrant, that the warrant did not describe the property to be seized with sufficient particularity. Further, appellant asserts that it was error to admit into evidence his statements made to the police and that he did not knowingly waive his constitutional rights.

It is appropriately stated in *Galena* v. *Municipal Court*, 237 Cal.App.2d 581, 586-587 [47 Cal.Rptr. 88]:

"Recently in *People* v. *Govea* (1965) 235 Cal.App.2d 285, 296-297 [45 Cal.Rptr. 253], we summarized the basic rules governing the issuance of search warrants as follows: 'In determining the sufficiency of an affidavit for the issuance of a search warrant, the standard or test of probable cause is approximately the same as that applicable to an arrest without a warrant, a commitment by a magistrate or an indictment by a grand jury [citations], namely, "such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." [Citations.] Facts stated in the affidavit are relevant on the issue of probable cause, irrespective of whether they are stated positively or on information and belief. [Citations.] The supporting evidence is not limited to that which would be admissible at the trial on the issue of guilt. [Citations.] . . . Generally speaking, in determining whether there is probable cause, each case must be decided on its own facts and circumstances. [Citations]'

"It is settled law that the requisite probable cause 'may be based on information furnished by an informant if the supporting affidavit also recites facts indicating that reliance on the information is reasonable. [Citations.]' [Citations.] In other words, the magistrate's finding of probable cause may rest upon the hearsay statement of the informant 'so long as a substantial basis for crediting the hearsay is

presented.' [Citations.] Nevertheless although the affidavit may be based on hearsay, the magistrate must be informed of some of the underlying circumstances from which the officer-affiant concluded that the informant was credible or his information reliable. [Citation.] In short, probable cause for the issuance of a search warrant may be based on the hearsay statement of an informant provided he is a reliable informant. [Citations.]

"In *Willson, supra* [46 Cal.2d 291 (294 P.2d 36)], the Supreme Court was called upon to determine whether information obtained by the police from an unidentified informant was sufficient in the light of other evidence to establish reasonable cause for making an arrest without a warrant. Relying upon its earlier opinion in *Boyles, supra* [45 Cal.2d 652 (290 P.2d 535)], the court stated that 'evidence must be presented to the court that would justify the conclusion that reliance on the information was reasonable. [Citation.] In some cases the identity of, or past experience with, the informer may provide such evidence [citation], [fn. omitted] and in others it may be supplied by similar information from other sources or by the personal observations of the police.' "

██ Each case of course must be determined upon its own facts and considering all of the facts here involved and established, we are persuaded that the police had ample grounds for seeking the search warrant and the magistrate was correct in issuing the warrant under the circumstances.

The statute (Pen. Code, § 1533) does not expressly require a separate statement as to good cause for serving the warrant in the nighttime. "To read into it such a requirement would only be to put an inordinate emphasis on form." (*Galena* v. *Municipal Court, supra*, p. 591.) ██ Certainly in this case it would appear from the affidavit that defendant would be more likely to be on the premises and in possession of the drugs in the nighttime rather than the daytime. Presumably Walker was gainfully employed in the daytime and in part carried on his nefarious sales of dangerous drugs at night. In any event, the magistrate did not abuse the discretion which was lodged with him. (See *Solis* v. *Superior Court*, 63 Cal.2d 774, 776-777 [48 Cal.Rptr. 169, 408 P.2d 945].)

It was the function of the trier of facts, not of this court, to appraise and weigh the evidence presented in the affidavit and this court cannot say in this case that, as a matter of law, probable cause was not established by the affidavit; as stated

in *People* v. *Aguilar*, 240 Cal.App.2d 502, 510 [49 Cal.Rptr. 584], ". . . There is a strong policy in favor of the use of warrants." The court, quoting approvingly from *United States* v. *Ventresca*, 380 U.S. 102, 108 [13 L.Ed.2d 684, 689, 85 S.Ct. 741], stated: "[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, . . . must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting."

█ With reference to the assertion that the contraband was not described with sufficient particularity, it is enough if the property to be seized is described with reasonable particularity. See *Dunn* v. *Municipal Court*, 220 Cal.App.2d 858, 868 [34 Cal.Rptr. 251], where the court said "illegal deer meat and/or elk meat" was sufficient. █ The term "dangerous drugs" was not too general. In fact the term as used herein is defined in the Health and Safety Code, section 11901, and specifically subdivision (b) thereof names "amphetamine" as a dangerous drug.

█ It is clear from a complete reading of the record in this case that appellant immediately following his arrest was advised of his constitutional rights. When he chose to speak as he did, he clearly and intelligently waived such rights. He was willing to and did answer some of the questions which were asked of him; however, when asked where the contraband came from appellant exercised his rights and stated that he would not talk about that until he had talked with his attorney. He obviously knew what his rights were, for he exercised them at times and waived them at other times. He should not be permitted to place himself in the position of saying that he did not know of his rights on the one hand while he exercises his rights on the other. Furthermore, the trier of fact made the determination with reference to the claims of defendant and upon conflicting evidence made a ruling. Unless the judge was in error, this court should not disturb his findings and order.

There is no merit to any of appellant's contentions.
The judgment, or order granting probation, is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 14, 1967.