[Civ. No. 5071. Fifth Dist. Jan. 10, 1980.]

GILBERT WALTER NUNES, Petitioner, v.
THE SUPERIOR COURT OF STANISLAUS COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Richard J. Palmer for Petitioner.

No appearance for Respondent.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, William G. Prahl and Garrick W. Chock, Deputy Attorneys General, for Real Party in Interest.

**OPINION**

**FRETZ, J.***—Petitioner seeks a writ of prohibition or mandate directed to the trial court to cause certain evidence to be suppressed.[1] Petitioner was charged by an information filed in superior court with 11 violations of law. Most of the charges were supported by evidence seized during searches conducted under authority of three warrants. Petitioner's motion to suppress was denied.

STATEMENT OF THE FACTS

*First Warrant.*

At about 5 p.m. on May 10, 1979, Modesto Police Officer Gary Vance met fellow officer Smith at the police station for the purpose of drafting an affidavit for a search warrant for petitioner's residence at 2708 Garvey Avenue in Modesto to seize a stolen motorcycle. The affidavit and other necessary documents were completed at about 11 p.m. and were taken to a magistrate's residence at about 11:30 p.m. The affidavit requested authorization for nighttime service of the warrant, and Officer Vance informed the judge that officers were standing by to serve the warrant. The judge signed the warrant and told Officer Vance, "Go get em." The search warrant was served on petitioner at the residence at about 12:30 a.m. on May 11. Officer Vance did not realize that the judge had failed to initial the blank space on the printed search warrant form authorizing nighttime service of the warrant until the next morning. When Officer Vance served the warrant, petitioner did not ask any questions about the document or object to the search of his residence.

During the search of May 11 (the first of three searches of petitioner's home), the officers seized certain motorcycle parts, bolt cutters and identification papers pursuant to the search warrant. In addition, a nine-millimeter pistol and plastic bags containing controlled substances not described in the warrant were seized from a garbage can containing the motorcycle parts; one marijuana plant growing in the backyard was also seized, though not described in the warrant.

---

*Assigned by the Chairperson of the Judicial Council.

[1]See appendix A for a chart showing counts, charges, physical evidence related to each, and grounds for seizure of each item.

*Second Warrant.*

On May 11, 1979, Modesto Police Officer Jim Waterman executed an affidavit in support of a request to obtain another search warrant to search petitioner's home. Officer Waterman set forth in his affidavit the descriptions of stolen property that had been seen in petitioner's garage earlier that day by the officers who had executed the first search warrant. He also incorporated by reference other stolen property described in a police report that he attached to his affidavit. Officer Waterman served this second search warrant on petitioner on May 12. He gave petitioner the search warrant, but not the referenced affidavit and its attached police report.[2] Petitioner did not ask what property the officers were seeking to seize. Officer Waterman seized, among other things, an air compressor, compressor hose, staples, blue nails, a staple gun—all described in the affidavit (count IX),—and a checkbook for a "Robert George" (not described, but not challenged by this petitioner), during this second search (count V).

Officer Waterman also seized a toolbox during this second search on May 11 because it matched the description of a toolbox that was reported stolen in April 1979. Officer Waterman had been investigating this theft. Inside the toolbox were screwdrivers with the name "Robert Peireira" on them (count VIII).

In addition, Officer Waterman seized other items based on their similarity to materials reported stolen and described in police documents which were not attached to the second search warrant. Among these items were a green toolbox and hand tools (count VII). The officer also took a red toolbox and four utility belts into his custody based on oral descriptions of stolen property given by Mr. Ron Wellwood, the victim listed in count IX of the verified complaint and information.

*Third Warrant.*

On May 15, 1979, Officer Waterman obtained a third search warrant for the search of petitioner's residence. Officer Waterman attached copies of six police reports of thefts which described the property to be seized. The court authorized the officers to seize "stolen property as indicated in the Affidavit and attached police reports, ..." The search

---

[2]The search warrant directed the seizure of "stolen property as indicated in the Affidavit and attached Police report...."

warrant was served May 15 at the residence. The affidavit and police reports were not shown to the person on whom service was made. Officer Waterman found and seized claw hammers, electrical cord and open-end wrenches (count VI) and numerous other plumbing and electrical items.

Petitioner alleges numerous errors were committed in obtaining and executing the three warrants under consideration, thereby prompting the present writ.

## DISCUSSION

I. *Did the magistrate's failure to specifically authorize a nighttime search through an unequivocal written direction vitiate the search and seizure undertaken pursuant to the warrant dated May 10, 1979?*

On the first warrant, it is undisputed that Judge Stone did not initial the blank on the warrant to authorize nighttime service. Officer Vance, one of the police detectives appearing before the magistrate, testified that he arrived at Judge Stone's residence at 11:30 on the evening of May 10, 1979, indicating that "we [have] several officers standing by to serve this Search Warrant." After signing the warrant, Judge Stone stated to the officer, "Go get em." In addition, Officer Vance indicated that he did not notice the magistrate's failure to initial nighttime service and, further, that petitioner did not ask any questions about the search warrant when it was read to him.

Judge Stone executed an affidavit on June 8, 1979, which was admitted into evidence at petitioner's preliminary hearing without objection, and which contains the following statement: "The Affidavit in support of the Search Warrant set forth a request for nighttime service. I considered this request, and it was my intention when I signed the Search Warrant to authorize nighttime service. My failure to initial the last sentence of the Search Warrant authorizing nighttime service was a clerical oversight. It was my understanding at the time I signed the Search Warrant and Affidavit that the Warrant was going to be executed promptly that same evening during the nighttime."

Petitioner moved to suppress evidence obtained from the search warrant on the ground that there was no separate, written authorization by

the magistrate supporting nighttime service. In denying petitioner's motion, the trial court found that the omission was merely a clerical error on the part of the judge; that he intended and knew that it was going to be served at night. At the special hearing subsequently held by the superior court, petitioner's motions to suppress evidence and dismiss the information were also denied. The court considered the reasoning of such cases as *People v. Superior Court (Robinson)* (1977) 75 Cal. App.3d 76 [141 Cal.Rptr. 917] and *Sternberg v. Superior Court* (1974) 41 Cal.App.3d 281 [115 Cal.Rptr. 893]. The court then found that (1) Judge Stone clearly intended nighttime service; (2) petitioner was informed of the nighttime search by the officer who read the warrant; and (3) the police officers demonstrated no bad faith in reasonably thinking the warrant indorsed nighttime service.

Petitioner argues that the evidence seized during the first search should have been suppressed because the magistrate failed to indicate his affirmative authorization of night service by initialing the night direction on the face of the warrant. Since the second and third warrants were based upon evidence discovered in the first search, it is petitioner's further contention that all evidence should be suppressed if the first warrant was defective.

Penal Code section 1533 provides that a magistrate has discretion, upon a showing of good cause, to insert a direction in a search warrant that it may be served at any time of the day or night. If no such direction is inserted, the statute declares that the warrant can only be served between the hours of 7 a.m. and 10 p.m. The court in *Sternberg v. Superior Court, supra,* 41 Cal.App.3d at pages 288-289, stated the concern of courts and identified the legislative purpose underlying Penal Code section 1533: "In the nighttime search cases the courts have been concerned with the magistrate's failure to exercise his discretion to authorize a nighttime search when he uses a form, similar to that prescribed in the form of warrant prescribed in section 1529, reading '. . .you are, therefore, commanded to make immediate search in the daytime (or at any time of the day or night, good cause being shown therefor). . .' without any deletions. (See *Rogers v. Superior Court* (1973) 35 Cal.App.3d 716, 719-720 [111 Cal.Rptr. 9]; *Powelson v. Superior Court* (1970) 9 Cal.App.3d 357, 362-363 [88 Cal.Rptr. 8]; *Call v. Superior Court* (1968) 266 Cal.App.2d 163, 164 [71 Cal.Rptr. 546]; and *People v. Mills* (1967) 251 Cal.App.2d 420, 421-423 [59 Cal.Rptr. 489]. Cf. *Tidwell v. Superior Court* (1971) 17 Cal.App.3d 780,

786-787 [95 Cal.Rptr. 213].) In *Rogers v. Superior Court, supra,* the court summarized as follows: '. . . the legislative purpose behind section 1533 is two-fold: (1) to require the magistrate to consider and determine whether he should exercise a discretion which authorizes a search peculiarly intrusive on the householder and especially dangerous to the officers; and (2) to enable the householder to know, from the face of the papers served on him, that the intrusion had, in fact, been authorized by a magistrate and that it was not the result of a mere whim or zealousness of the police.' (35 Cal.App.3d at p. 720.)" After examining the case law which explores the limits of Penal Code section 1533, it appears that the lower court properly rejected petitioner's objection to the nighttime service authorized in the first warrant.

Petitioner predicates error in the denial of his motions based upon *Powelson v. Superior Court* (1970) 9 Cal.App.3d 357 [88 Cal.Rptr. 8], *Rogers v. Superior Court* (1973) 35 Cal.App.3d 716 [111 Cal.Rptr. 9], and *Bowyer v. Superior Court* (1974) 37 Cal.App.3d 151 [111 Cal.Rptr. 628, 112 Cal.Rptr. 266]. Although these precedents appear to provide support for petitioner's position, close scrutiny reveals fundamental differences from this case.

In *Powelson,* the magistrate failed to initial or strike out any words in a warrant command ". . . 'to make immediate search in the daytime *(at any time of the day or night, good cause being shown therefor).'"* (*Powelson v. Superior Court, supra,* 9 Cal.App.3d at p. 362.) The executing judge had testified at the suppression hearing that he had intended to authorize nighttime service by *not* deleting the phrase "at any time of the day or night." Based upon *People v. Mills* (1967) 251 Cal.App.2d 420, 422 [59 Cal.Rptr. 489] and *Call v. Superior Court* (1968) 266 Cal.App.2d 163, 164 [71 Cal.Rptr. 546], the court concluded that the magistrate's failure to act should not be construed as an exercise of his discretion, since there was no assurance that the time of search was carefully considered. (*Powelson v. Superior Court, supra,* 9 Cal.App.3d at p. 363.) In contrast to *Powelson,* the judge in the present case stated that his failure to initial was a *clerical mistake.*

Petitioner also places reliance on *Rogers v. Superior Court, supra,* 35 Cal.App.3d 716, involving a blind magistrate who failed to indicate on the warrant any time of search (day or night). At the suppression motion, the magistrate testified: "'I don't remember specifically, but my recollection of the thing was that there was both nighttime and daytime

on there, and after hearing the affidavit together with what conversation there was with reference to it, I directed that it be served forthwith, which would have meant nighttime.'" (*Id.,* at pp. 718-719.) The court ruled that the *equivocal* nature of the magistrate's testimony did not sufficiently support "a finding that he had definitely and positively directed...a nighttime search." (*Id.,* at p. 720.) But the court indicated that it was not deciding the validity of a warrant which, due to clerical error, does not accurately reflect the magistrate's determination. (*Ibid.*) Two points demonstrate the inapplicability of *Rogers* to the actions of Judge Stone. Unlike *Rogers,* Judge Stone *unequivocally* clarified his intention to direct nighttime service in a subsequent affidavit. Moreover, this case does involve a clerical mistake by the magistrate—a question expressly left unresolved in *Rogers.*

Petitioner finally alludes to *Bowyer* v. *Superior Court, supra,* 37 Cal. App.3d 151, where the court ruled that a telephonic "affidavit" and oral warrant contravened the requirement of procuring a *written* warrant. (*Id.,* at p. 164.) Petitioner suggests that this requires a magistrate to insert his tangible authorization of nighttime service, but the point is not well made. *Bowyer* involved a situation in which no written warrant, signed or unsigned, was existent at the time of search and seizure. In the case at bar, however, Officer Vance had a written warrant and read it to petitioner, including the portion authorizing nighttime service.

The reasoning of *Sternberg* v. *Superior Court, supra,* 41 Cal.App.3d 281 and *People* v. *Superior Court* (*Robinson*), *supra,* 75 Cal.App.3d 76 is more appropriate to Judge Stone's omission.

In *Sternberg,* the magistrate inadvertently failed to sign a search warrant delivered to levying officers, although he did sign and approve the supporting affidavit. The executing police officers, in good faith and without actual knowledge of the defect, seized certain articles pursuant to the warrant. After discovering this absence on the warrant, one of the officers obtained the magistrate's signature later on the same day. (*Sternberg* v. *Superior Court, supra,* 41 Cal.App.3d at pp. 284-285.) Upon appeal, the court sustained the lower court's denial of the suppression motion. After reiterating the two reasons behind Penal Code section 1533, the court found (1) that the magistrate had clearly exercised his discretion in granting the unsigned warrant, and (2) that the householder knew that the search had been authorized. (*Id.,* at pp. 289-290.) In determining that the second consideration of Penal Code

section 1533 had been satisfied, the court said: "Here [where the warrant was unsigned by the judge], as in the case of a nighttime search, the second purpose of the warrant is to let the householder know that the intrusion has been authorized by a magistrate. The lack of the signature of the magistrate whether made by him [citation], or by someone else under his authority [citation], would appear to be fatal to the accomplishment of that purpose. *If petitioner, or the occupant of the premises where he allegedly had stored stolen goods, had challenged the warrant, any further attempt to conduct a legal search and seizure under its authority would have been forestalled....Here there was no such challenge....*

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"It is, therefore, concluded that under the peculiar circumstances of this case any insufficiency on the face of the warrant, because the magistrate inadvertently failed to sign it, was cured by his affixing his signature at the earliest opportunity after such omission was discovered and prior to any challenge to the warrant." (*Sternberg* v. *Superior Court, supra,* 41 Cal.App.3d at pp. 290-291, italics added.) In addition, the court also indicated that even if the warrant was insufficient on its face, there was no reason to suppress the evidence seized because the officers acted in good faith and without actual knowledge of the defect. (*Sternberg, supra,* at p. 292.) The court stated this conclusion as follows: "...it [the trial court denying the suppression motion in *Sternberg* ] has looked at the totality of the circumstances and ascertained that the purposes of the exclusionary rule will not be served by its application to the technically defective search which was effected in this case. In *People* v. *Moore* [(1973) 31 Cal.App.3d 919, 922-927 (107 Cal.Rptr. 590)], the court found that the warrant was defective on its face because it contained printed references to narcotics when in fact it was issued on an affidavit which showed probable cause to search for restricted drugs. The court after examining the purposes of the exclusionary rule,...concluded: 'It is obvious that the error which occurred in the preparation of the search warrant here involved was purely clerical in nature. Clearly, the issuing magistrate intended to direct a search for dangerous drugs and only by reason of clerical error did he fail to insert such direction on the face of the warrant. While we do not condone carelessness on the part of the magistrate in failing to note such error, we conclude that the defect did not in any way substantially prejudice the rights of the defendant.' (31 Cal.App.3d at p. 927.) 'When

the reason of a rule ceases, so should the rule itself.' (Civ. Code, § 3510.)" (*Sternberg v. Superior Court, supra,* 41 Cal.App.3d at p. 294.)

Similarly, in *People v. Superior Court (Robinson), supra,* 75 Cal. App.3d 76, the court upheld the validity of a search warrant where the lack of signature of the magistrate was not discovered until the time of trial. Testimony by the magistrate at the suppression hearing confirmed the fact that she intended that the warrant be issued, had signed the affidavit for the warrant, but had inadvertently failed to sign the warrant. The levying officer, under the impression that the original warrant had been signed, gave a xeroxed copy of the document to the petitioner before searching the premises, and there was no comment made about the lack of the judge's signature. (*Id.,* at pp. 78-79.) Relying upon *Sternberg,* the court in *Robinson* found that the magistrate's clerical error did not make the warrant legally insufficient. Moreover, the court also determined that the householder did not notice the mistake and that the officers' good faith execution eliminated any reason to apply the exclusionary rule. (*Robinson, supra,* at pp. 79-80.)

■ Applying the principles of *Sternberg* and *Robinson,* it appears that the trial court in this case correctly denied petitioner's objections. First, Judge Stone clearly stated his "neutral and detached" intention to authorize nighttime service by his declarations in the subsequent affidavit, in spite of the clerical error of failing to initial the warrant. Second, uncontroverted testimony at the preliminary hearing revealed that petitioner Nunes was read the warrant (which contained the nighttime direction) and did not object to its service. Finally, Officer Vance stated that he did not realize that Judge Stone had made a clerical mistake. Vance executed the warrant on that premise. The officer's assertion of good faith is further bolstered by the fact that Judge Stone signed the warrant late at night and told the officers to "Go get em." Since the magistrate's discretion was properly exercised and the warrant was read to petitioner who did not object, in the absence of reasons for invoking the exclusionary rule, the denial of the suppression and dismissal motions was not error.

II. *Did the superior court commit error in finding that certain items not described in the warrants or accompanying affidavits but obtained in the searches authorized by the warrants dated May 10 and 11, 1979, were seizable as plain view materials having a nexus to*

*criminal activity based upon an officer's general information and belief that similar property had been reported stolen in numerous police reports?*

From the search warrants, the returns made on the warrants, and the transcript of the preliminary examination, all of which were before the trial judge at the time of his ruling upon the suppression motion, it is obvious that the officers felt they had found a residence at which items stolen from many places over a period of several months had been stored. Many items were seized. Not all of the seized items are relevant to the matter now before us.

Defense counsel asked for, but did not receive, a stipulation that items seized during any of the three searches which were unconnected to pending criminal counts would not be the subject of future charges. However, it was agreed that if there were "additional items which we [the district attorney's office] are planning to use during the course of the trial," the court could then rule upon such items. Pursuant to this stipulation, the court refused to suppress evidence, not properly the subject of any particular count, without prejudice to a new motion to suppress being made, in the event the People attempted to use it in the trial of this case or any subsequent proceeding.

Our consideration is therefore limited to the items seized by officers in one of the three searches and described in any of the eleven charges against the petitioner.[3]

Since we have found the first search warrant to have been properly issued and served, the only items remaining subject to the motion are those connected with the charges contained in counts VI, VII, VIII and IX. The items connected with counts VI, VII and VIII were said by the officer to have been seized because there were stolen property reports on file with the Modesto Police Department which contained a description of the types of articles taken during the search. Officer Waterman summarized the grounds upon which he seized these items: "Articles that either I or other officers had knowledge of similar articles being stolen contained in police reports based on their knowledge *or items which I felt could be readily identified by searching through the other*

---

[3]The compilation of the several counts, the physical evidence described in each count, the search number and grounds for seizure of the items are set forth in appendix A.

*detectives' reports* because there were only two other burglary detectives with me at the time of the Search Warrant;..." (Italics added.)

Petitioner urges that a policeman's general information and belief that the seized items matched property reported stolen in numerous reports does not constitute a sufficient cause to believe that such evidence related to criminal activity attributable to petitioner. In ruling upon the motion to suppress these items below, the trial court said: "The officer was reasonable under the circumstances when he seized the property which he thinks he reasonably identified properly as stolen property that he's investigated." The court sustained the seizure of the articles as being within the levying officer's authority, although noting there was "nothing in the record to tell...whether or not the officers acted reasonably or unreasonably in picking those items up."

We believe that the court adopted an overly broad view of the plain view doctrine.

■ The plain view doctrine was summarized in *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 157 [81 Cal.Rptr. 613, 460 P.2d 485]: "When officers, in the course of a bona fide effort to execute a valid search warrant, discover articles which, although not included in the warrant, are reasonably identifiable as contraband, they may seize them whether they are initially in plain sight or come into plain sight subsequently, as a result of the officers' efforts." Nonetheless, police officers are foreclosed from seizing items indiscriminately; they must demonstrate that a nexus exists between the item to be seized and criminal behavior. (*Warden* v. *Hayden* (1967) 387 U.S. 294, 307 [18 L.Ed.2d 782, 792, 87 S.Ct. 1642]; *People* v. *Hill* (1974) 12 Cal.3d 731, 762 [117 Cal.Rptr. 393, 528 P.2d 1], overruled on other grounds in *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 896 [135 Cal.Rptr. 786, 558 P.2d 872]; *People* v. *Superior Court* (*Williams*) (1978) 77 Cal.App.3d 69, 79 [143 Cal.Rptr. 382], disapproved on other grounds in *People* v. *Superior Court* (*Meyers*) (1979) 25 Cal.3d 67, 77, fn. 9 [157 Cal.Rptr. 716, 598 P.2d 877].)

In *People* v. *Miller* (1976) 60 Cal.App.3d 849 [131 Cal.Rptr. 863], the court aptly discussed the antecedents of and policy behind the nexus test: "The nexus rule originated in *Warden* v. *Hayden* (1967) 387 U.S. 294, 307 [18 L.Ed.2d 782, 792, 87 S.Ct. 1642], which articulated it as follows: 'There must...be a nexus—automatically provided in the case

of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus in the case of "mere evidence," probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction.'

"The quoted rule applies with equal force to a lawful warrantless search and to searches authorized by a warrant. 'In both situations the same fundamental proposition controls—the scope of a search must be circumscribed by the reasons which justified its inception. It is by this rational limitation that the Fourth Amendment protects the individual against unfettered discretion. (*Terry* v. *Ohio,* . . . 392 U.S. 1, 29 [20 L.Ed.2d 889, 910-911, 88 S.Ct. 1868]; *Marron* v. *United States* (1927) 275 U.S. 192, 196 [72 L.Ed. 231, 237, 48 S.Ct. 74].) In short, the "nexus rule" is necessary to achieve what we intended in *Skelton*—a "realistic balancing of the requirements of effective law enforcement and the necessity to protect the privacy of the citizen from unwarranted governmental intrusion." (*People* v. *Skelton* [*Skelton* v. *Superior Court*],. . .1 Cal.3d 144, 158 [81 Cal.Rptr. 613, 460 P.2d 488].)' (*People* v. *Hill* (1968) 12 Cal.3d 731, 762 [117 Cal.Rptr. 393, 528 P.2d 1].)

"As described in *Warden* v. *Hayden, supra,* the nexus rule pivots on the officer's probable cause to believe that the seized article will aid in a particular apprehension or conviction. Probable or reasonable cause is defined '"as that state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. . . . No exact formula exists for determining reasonable cause, and each case must be decided on the facts and circumstances presented to the officers at the time they were required to act."' (*People* v. *Terry* (1970) 2 Cal.3d 362, 393 [85 Cal.Rptr. 409, 466 P.2d 961].)" (*People* v. *Miller, supra,* 60 Cal.App.3d at pp. 852-853.)

■ In petitioner's case, the challenged items are correctly categorized as "mere evidence" relating to criminal activity, to wit: receiving stolen property which is believed to match articles described in police reports not in the possession of the executing officers. Since *People* v. *Terry* (1970) 2 Cal.3d 362, 393 [85 Cal.Rptr. 409, 466 P.2d 961], cert. dism. *sub nom., Terry* v. *California* (1972) 406 U.S. 912 [32 L.Ed.2d 112, 92 S.Ct. 1619], indicates that officers can justify seizure on "an honest and strong suspicion," it is important to clarify what constitutes grounds for adequate suspicion. The court in *Miller* provided the fol-

lowing discussion of the concept: *"An honest and strong suspicion may have its origin in one or a combination of objects, events and circumstances.* As the 'man of ordinary care and prudence' conducts his authorized search for the items designated in the warrant, one or several factors may arouse an honest and strong suspicion directed at previously unsuspected objects. The object may have intrinsic suspicion-arousing qualities; thus, as the *Warden* formulation suggests, contraband automatically provides a nexus. *Where the object is evidence and not contraband, it will seldom be the sole source of an honest and strong suspicion.* Rather, it will have that capacity only in combination with other circumstances. The standard definition of probable cause (*People* v. *Terry, supra*) necessarily implies that all the circumstances are to be considered. *It permits the officer to take cognizance of the entire situation confronting him at the time and place of the search, including not only the intrinsic qualities of the object but also the peripheral circumstances attending its discovery.* The probable cause concept serves to prevent arbitrary intrusions; it does not blind the officer to suspicion-arousing activities at the time and place of the search. The figurative person of ordinary care and prudence would be a fool if he were blinded to the ambient circumstances as a permissible source of probable cause." (*People* v. *Miller, supra,* 60 Cal.App.3d at pp. 853-854, italics added.) Although officers can seize plain view items based on the totality of circumstances existing at the time of search, limitations have been recognized in order to place reasonable boundaries on police discretion.

In *People* v. *Murray* (1978) 77 Cal.App.3d 305 [143 Cal.Rptr. 502], this court examined the parameters of the plain view doctrine in a case involving stolen property. Pursuant to a search warrant, officers entered certain premises and seized two television sets not described by the warrant as plain view articles. Officers claimed they had general knowledge that the defendant in the case was fencing stolen property because they observed a shotgun and some 67 television sets, 20 of which had their serial numbers removed, when entering the searched premises. (*Id.,* at pp. 309, 311.) This court rejected the contention that this evidence justified seizure under plain view standards. Initially, this court defined the scope of the plain view test: "Most commonly, the plain view doctrine is applied to items which are inherently recognizable as contraband, such as drugs, drug paraphernalia or illegal weapons. In *Skelton,* however, the officers, after they entered the premises pursuant to the authority of a search warrant, saw the following items not included in the warrant which were uncovered during the search: five

women's rings; four women's watches; one man's watch; and two sets of silverware. The Supreme Court upheld the seizure of these items under the plain view doctrine, reasoning that the officers could rely upon burglary reports they had brought with them to identify the items as contraband. It would, in our opinion, also be reasonable to permit the officers to seize, for example, appliances from which serial numbers have been obliterated (see *People* v. *Baker* (1968) 267 Cal.App.2d 916, 918-920 [73 Cal.Rptr. 455]) or property which is otherwise readily identifiable as contraband through other distinctive markings or which during the course of a search is determined to be contraband through radio identification by an official source." (*People* v. *Murray, supra,* 77 Cal.App.3d at pp. 309-310.)

Applying this rationale, the court then determined that the seizure under plain view doctrine was unwarranted. The court stated: "The two television sets upon which counts one and two were predicated *were not inherently identifiable as contraband nor were they identified at the scene as having obliterated serial numbers or other distinctive markings to set them apart from any other Sony or RCA sets of the same make and model.* It follows therefore that the seizure was not justified under the plain view doctrine and evidence thereof should have been suppressed.

"......................

"We decline to stretch the plain view doctrine to those limits as to do so would be to throw out the central purpose of a warrant, which is to interpose an unprejudiced and detached judicial mind between the officer and the seizure and to eliminate discretion in the officer. (*People* v. *Hill* (1974) 12 Cal.3d 731, 762 [117 Cal.Rptr. 393, 528 P.2d 1] (overruled on other grounds in *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 896 [135 Cal.Rptr. 786, 558 P.2d 872]).) *Notwithstanding a generalized suspicion that the television sets and other items had been stolen, and aside from the 20 television sets from which the serial numbers had been removed, the testimony at the preliminary hearing did not establish that the officers in fact knew which items were contraband and which items legitimately belonged to the appellant."* (*People* v. *Murray, supra,* 77 Cal.App.3d at pp. 311-312, fns. omitted, italics added.)

The California Supreme Court, in *People* v. *Superior Court (Meyers), supra,* 25 Cal.3d 67, recently condoned plain view seizure when victims of a burglary identified property as stolen during a war-

rant search by policemen. (*Id.*, at p. 70.) The court found that the on-site identification of the burglary victims sufficiently established the suspicion necessary for seizure. It said: "Moreover, by pointing out to Officer Riddell items of their stolen property, Mr. and Mrs. Lane provided the requisite 'rational link' between the articles confiscated and possible criminal behavior by defendant. Admittedly the items of personal property seized were not obvious objects of contraband: as Officer Riddell testified, 'but for Mr. and Mrs. Lane being present' he would not have known which property on defendant's premises was stolen. Nevertheless, the Lanes articulated specific facts from which Officer Riddell reasonably inferred that the articles seized were in fact contraband. The Lanes accompanied the officer not as a substitute for specificity in the search warrant, but solely to provide precise identification of contraband." (*People v. Superior Court, (Meyers), supra,* 25 Cal.3d at pp. 74-75, fns. omitted.) Thus, it appears that the police must have a *specific* basis upon which to rationally select items as evidence of criminal activity under the plain view doctrine.

With these principles in mind, it is apparent that the officers did not possess the requisite suspicion to seize the items pertinent to counts VI, VII and VIII during their search under the second warrant. *Murray* indicates that the items should be inherently identifiable as contraband, possess obliterated serial numbers or distinctive markings indicative of stolen property, or be identifiable as contraband through radio identification. In the present case, the officers seized the articles on the general suspicion that they coincided with descriptions of stolen property contained in police reports not in their possession. One officer testified that he called in many serial numbers of the plain view items before seizure. He stated that "the numbers did not come back through the computer, did not come back stolen. However, this is not unusual. Someone will say, 'I had something stolen. I had the serial number, but I don't know what it is.' So it's not unusual for serial numbers to not be on the computer if they are in fact stolen." The officer's general suspicion that the property would match stolen property in police reports does not comport with the guidelines set forth in *Murray*, since "the officers [did not] in fact [know] which items were contraband and which items legitimately belonged to the appellant." (*People v. Murray, supra,* 77 Cal.App.3d at p. 312.) Further, unlike *Meyers*, the officers in the instant case did not have the victims' identification to form their "honest and strong suspicion." Therefore, pertinent items seized during the second search were not properly taken under the guise of plain view articles.

Viewed in light of the limitations suggested by *Murray* and *Meyers*, the lower court committed error in sustaining seizure of the items pertaining to counts VI, VII and VIII under the plain view doctrine.

Certain of the property seized in connection with the charge contained in count IX was described in the affidavit for the warrant. Certain other property relevant to count IX and seized in the second search was not described in the warrant or affidavit or attachments. However, these items were seized because the police officer talked to Ron Wellwood, the victim, before the search and Wellwood described items, i.e., red toolbox, as having been stolen from him. As to these items the proper nexus between criminal behavior and the items was present—a specific basis for selection of the items was known to the officer. Thus, if the second search was valid, these items were properly seized. But the officer, in the affidavit, then prayed that the warrant issue "for any of the other property stolen in this case and described in the attached Modesto Police Department Crime Report, . . ." For this reason, we must consider the third issue raised by the petitioner.

III. *Was the description in the second warrant providing for seizure of "stolen property as indicated in the Affidavit and attached Police report" of sufficient particularity so as to place meaningful limits on the objects to be taken by serving officers?*

Petitioner contends that the second warrant failed to particularly describe the things to be seized when it commanded officers to obtain "stolen property as indicated in the Affidavit and attached Police report. . . ." This, argues petitioner, effectively meant that the police conducted a general exploratory search in violation of his right to privacy.

The Fourth Amendment to the United States Constitution; article I, section 13 of the California Constitution; and Penal Code section 1525 all require that the warrant particularly describe the thing or property to be seized. Penal Code section 1529 demands that the items be described with "reasonable particularity, . . ." This mandate is satisfied if the description of the property in the warrant "imposes a meaningful restriction upon the objects to be seized." (*Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 249 [118 Cal.Rptr. 166, 529 P.2d 590]; cf. *Marron* v. *United States* (1927) 275 U.S. 192, 196 [72 L.Ed. 231, 237, 48 S.Ct. 74] (no discretion vested in levying officer).)

Whether the description in the warrant is sufficiently definite is a question of law on which an appellate court makes an independent judgment. (See *Aday v. Superior Court* (1961) 55 Cal.2d 789, 795-796 [13 Cal.Rptr. 415, 362 P.2d 47]; *People v. Murray, supra*, 77 Cal. App.3d at p. 308; *Thompson v. Superior Court* (1977) 70 Cal.App.3d 101, 108 [138 Cal.Rptr. 603].)

This court, in *People v. Murray, supra*, 77 Cal.App.3d at pages 308-309, summarized cases which struck down property descriptions in search warrants: "Courts have held the following descriptions in search warrants to be insufficient: "'all books, records, accounts and bank statements and cancelled checks of the receipt and disbursement of money and any file or documents referring to Harold D. Miller, June Trower, June Miller or Stacy Miller"' (*Burrows v. Superior Court,* . . . 13 Cal.3d 238, 241, 249); "'certain personal property used as a means of committing. . . larceny'" (*People v. Mayen* (1922) 188 Cal. 237, 240, 242 [205 P. 435, 24 A.L.R. 1383] (overruled on other grounds in *People v. Cahan* (1955) 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513], and *People v. Matteson* (1964) 61 Cal.2d 466, 470 [39 Cal.Rptr. 1, 393 P.2d 161])); "'any and all other records and para-phernalia'" connected with the business being searched (*Aday v. Superior Court* (1961) 55 Cal.2d 789, 795-796 [13 Cal.Rptr. 415, 362 P.2d 47] (disapproved on other grounds in *Hicks v. Miranda* (1975) 422 U.S. 332, 346 [45 L.Ed.2d 223, 237, 95 S.Ct. 2281])); stolen mer-chandise (*Lockridge v. Superior Court* (1969) 275 Cal.App.2d 612, 625 [80 Cal.Rptr. 223]); "'Evidences of indebtedness. . .including but not limited to such items as bills, contracts, checkstubs, checks, bank-books. . .'" (*Griffin v. Superior Court* (1972) 26 Cal.App.3d 672, 692, 694 [103 Cal.Rptr. 379])." In *Murray,* this court invalidated a warrant authorizing seizure of "'television sets, power tools, appliances, hand tools, home furniture, clothing, power drill press'" because of its over-broad description. (*People v. Murray, supra*, 77 Cal.App.3d at p. 308.) And, in *Thompson,* this court found the description "*stolen property*" to be similarly defective. (*Thompson v. Superior Court, supra*, 70 Cal. App.3d at p. 105.)

The majority of these cases articulated two considerations when strik-ing down overbroad property descriptions in search warrants. These concerns are: (1) to bridle the discretion of executing officers, and (2) to insure that a meaningful limitation exists on the face of the warrant. (See, e.g., *Thompson v. Superior Court, supra*, 70 Cal.App.3d at pp. 109-110.)

Applying these considerations to petitioner's case, the second warrant contained descriptions adequately limiting police discretion. For example, as relevant to count IX, the affidavit described an Englo air compressor, blue in color, bearing serial number SN18771. The police report attached to it described "200 foot [*sic*] of half inch compresser [*sic*] hose red in color...1/2 box of Blue nails...1 Passload Staplegun Aluminum...A full box of Tasload staples...." Unlike *Thompson*, the stolen property to be seized here was narrowed by the affidavit and police report mentioned on the face of the warrant. The officer testified at the preliminary hearing that he had the original incorporated documents in his possession when serving the warrant. This suggests that the search was not exploratory, but had meaningful limitations imposed by the supplemental documents. As noted in *Thompson* by this court: "We, therefore, glean from *Burrows* [v. *Superior Court,' supra*, 13 Cal.3d 238, 250], the general principle that while the *facts set forth in the affidavit may be used to fix the parameters of the search authorized by the warrant*, the facts in the affidavit cannot be used to cure an impermissibly broad warrant." (*Thompson* v. *Superior Court, supra*, 70 Cal.App.3d at p. 110, italics added.)

Thus, the description "stolen property as indicated in the Affidavit and attached Police report" did not offend the mandate of reasonable particularity required for search warrants.

IV. *Did the officers serving the second and third warrants conduct an unlawful search by failing to provide copies of the affidavits and police reports supporting the warrants to owners of the searched premises?*

Petitioner argues that execution of the second and third warrants was unlawful, since Penal Code section 1531 requires the officer serving the warrants to give notice of his authority and purpose and that such authority and purpose are announced by the reading of the warrants to the householder. If reading the warrants, or furnishing copies of the warrants, is required, then service here was improper, unless the requirement was waived, because the officer read and handed to petitioner only the warrants themselves, not the incorporated affidavits and police reports which contained the description.

We agree that reading the warrants to the householder and/or leaving copies of the warrants with the householder are highly desirable

practices. But we search in vain for California law requiring either reading or leaving copies of the warrants with the householder.

It appears to be basic law that "unless a statute or court rule so provides, an officer charged with the execution of a search warrant is not obliged to exhibit the warrant as a prerequisite to the right to execute it. Nor is the officer required, in the absence of statute, to read the warrant to the person against whom the search is directed. Rather, the warrant is executed by making the search. But it has been held that, even where no statute imposes such a requirement, the officer must reveal his identity and his authority when requested to do so by the owner, occupant, or one in rightful possession of the property to be searched or the thing to be seized. [Citations.]" (68 Am.Jur.2d, Searches and Seizures, § 115, p. 771, fns. omitted.)

As Professor LaFave said: "In many jurisdictions, statutes or rules declare that an officer executing a search warrant must exhibit or deliver a copy of the warrant at the place searched. Illustrative is the federal rule, which provides that the 'officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant or shall leave the copy at the place from which the property was taken.' Provisions of this type are most desirable, as they 'put the possibly aggrieved party on notice of the authority and purported reasons for the search, and enable him to prepare to contest it if he so desires,' and also make it possible for him to 'know that there is color of authority for the search, and that he is not entitled to oppose it by force.'

"Under the prevailing view, these provisions are deemed to be ministerial only, so that 'absent a showing of prejudice' failure to comply with them does not void an otherwise valid search. And if no such provision exists in the jurisdiction, then the executing officer is not obliged to exhibit or read the warrant to the person in charge of the place to be searched." (2 LaFave, Search and Seizure: A Treatise on the Fourth Amendment (1978) § 4.12(a), pp. 185-186, fns. omitted.)

That California has been regarded as having no law on the point is demonstrated by the following provision from a staff draft for the Joint Legislative Committee for Revision of the Penal Code: "§ 3460. *Copy of search warrant; receipt for property taken* (a) If the search warrant is executed, a copy of the warrant shall be left by the peace officer executing the warrant with any person from whom any property was

seized or in the absence of any person the copy shall be left at the place from which any property was seized. If no property was seized, a copy of the warrant shall be left by the peace officer executing the warrant at the place where the search occurred.

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"COMMENT: Subdivision (a) of Section 3460 is new and requires the peace officer executing the warrant to leave a copy of it with the person or at the place described in the warrant regardless of whether property was seized." (The Crim. Procedure Code, § 3460 and com., pp. 94-95 (J. Legislative Com. for Revision of the Pen. Code, 1973-74).)

As we have said, we agree with the following suggestion for conduct of an officer serving a search warrant and believe that most officers in most situations follow a similar procedure: "The officer should show the original search warrant to the occupant and give him a copy of the warrant." (Cal. District Attys. Assn. and L. A. County District Attys. Office, Search Warrants: A Manual (1977) pp.X-3–X-4.) But the footnote in the manual says: "These are merely recommended procedures designed to give the occupant notice of the authority for the search. The Penal Code does not set forth any procedures in this area." (*Id.*, at p. X-4, fn. 1.)

Here, the officer read the warrants to petitioner. He also gave copies of the warrants to petitioner. The petitioner voiced no objection to their execution nor did he inquire about the papers incorporated into the warrants. The evidence is clear that the policeman had the affidavits and attached police reports with him and available for inspection. We therefore conclude that the officers serving the second and third warrants did not conduct an unlawful search.

Because the validity of the first warrant influences the subsequent warrants and searches, we also consider the petitioner's fifth issue.

V. *Was there an insufficient statement of probable cause for a nighttime search in the affidavit accompanying the first warrant?*

Finally, petitioner suggests that there was insufficient probable cause for the magistrate to direct nighttime service on the first search warrant. This contention is without merit for two reasons.

■ First, petitioner is barred from raising this issue for the first time on appeal. Examination of petitioner's points and authorities and briefs reveals that he never mentioned the probable cause issue at either one of the two suppression hearings. Since petitioner is challenging the sufficiency of the first warrant under a new legal theory, he is foreclosed from presenting this argument on appeal after failing to offer it in the suppression hearing. To allow introduction of a new legal theory to support or contest the admissibility of evidence seized would defeat the purpose of Penal Code section 1538.5 and discourage parties from presenting all arguments relative to the question when the issue of admissibility is initially raised. (See *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640-641 [108 Cal.Rptr. 585, 511 P.2d 33].)

■ If the issue had been properly raised in lower court proceedings by petitioner so we could review it, we would find there were sufficient facts in the first warrant justifying probable cause for the nighttime search. In his affidavit to the warrant, Officer Smith indicated circumstances suggesting both that stolen motorcycle parts are sold at night and that the stolen items might be moved by petitioner and his friends if not seized promptly. Petitioner suggests that the instant situation is analogous to *People* v. *Watson* (1977) 75 Cal.App.3d 592, 595, 598 [142 Cal.Rptr. 245], where this court found a nighttime warrant invalid when the document failed to demonstrate why marijuana existing in a suspect's house during the evening would not be there the next morning. Unlike *Watson,* however, the officer in this case recounted facts tending to suggest that stolen motorcycle parts might be sold or removed from the subject premises. He declared that he and other investigating officers had been observed that same day as they drove by the subject premises and that four months before a parolee living in the same block had "cleaned his house" after being informed of a stakeout by similar observers. If the affidavit, read in a common sense manner and as a whole reasonably supports the inference that the interests of justice are best served by the authorization of nighttime service, provision for such service in the warrant is proper. (See *People* v. *Arno* (1979) 90 Cal. App.3d 505, 526 [153 Cal.Rptr. 624].) Moreover, absent an abuse of discretion, the magistrate's finding of a reasonable necessity of nighttime service will not be disturbed on appeal. (*Solis* v. *Superior Court* (1966) 63 Cal.2d 774, 776-777 [48 Cal.Rptr. 169, 408 P.2d 945]; *People* v. *Mardian* (1975) 47 Cal.App.3d 16, 35 [121 Cal.Rptr. 16]; *People* v. *Walker* (1967) 250 Cal.App.2d 214, 219-220 [58 Cal.Rptr. 495].) With these precepts in mind, we conclude that the magistrate in

petitioner's case had sufficient cause upon which to authorize service of the first warrant.

## CONCLUSION

Let a peremptory writ of mandate issue directing respondent Superior Court of Stanislaus County to modify its order No. 160809 (dated Aug. 3, 1979) denying petitioner Nunes' motion to suppress and to enter an order granting a motion to suppress the items described in counts VI, VII and VIII. As to any other evidence seized on the dates on which any of the three warrants were served, the petition for writ of prohibition or mandate is denied.

Brown (G.A.), P. J., and Franson, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied March 6, 1980.

---

## APPENDIX A

LEGEND: HC = Health and Safety Code
PC = Penal Code
\* = Seized under plain view suspicion doctrine
— = Not applicable

| | | | GROUNDS FOR SEIZURE | | | |
|---|---|---|---|---|---|---|
| Count | Charge | Physical Evidence | Described In Warrant | Plain View Contraband | Plain View Suspicion | Challenged |
| I | HS § 11351 Possession of Cocaine for sale | Cocaine | No | Found in 1st search and admitted | — | No |
| II | HS § 11378 Possession of Methamphetamine for sale | Methamphetamine | No | Found in 1st search and admitted | — | No |
| III | HS § 11377 Possession of Secobarbital | Secobarbital | No | Found in 1st search and admitted | — | No |
| IV | PC § 496 Receiving stolen property (Vander-Hyden) | Browning 9 mm. automatic pistol | No | Found in 1st search and admitted | — | No |

| Count | Charge | Physical Evidence | GROUNDS FOR SEIZURE | | | Challenged |
|---|---|---|---|---|---|---|
| | | | Described In Warrant | Plain View Contraband | Plain View Suspicion | |
| V | ·PC § 496 Receiving stolen property (Robt. George) | Checkbook | No | Found in 2d search and admitted | — | No |
| VI | PC § 496 Receiving stolen property (David Coffman) | Claw hammers Electrical cord Open-end wrenches | No | — | * * * (Found in 3d search) | Yes |
| VII | PC § 496 Receiving stolen property (Wm. Fowler) | Pipe wrenches Offset wrench Flaring tool Green toolbox | — | — | * * * * (Found in 2d search) | Yes |
| VIII | PC § 496 Receiving stolen property (Robt. Peireira) | Screw drivers Screw cutter | — | — | * * (Found in 2d search) | Yes |
| IX | PC § 496 Receiving stolen property (Ron Wellwood) | Red toolbox *Staples* *Blue nails* *Compressor hose* *Air compressor* *Staple gun* Nail pouch Hand tools | Yes if italicized (described in 2d warrant) — No if not italicized | — | * — — — — — * * (Found in 2d search) | Yes |
| X | PC § 459 Burglary | — | — | — | — | — |
| XI | HS § 11358 Cultivating marijuana | Marijuana plant | No | Found in 1st search and admitted | — | No |