**UNITED STATES of America,
Plaintiff,**

v.

**Ernest John TRANQUILLO, Jr.,
Defendant.**

**No. 70–236 Cr.T.**

United States District Court,
M. D. Florida,
Tampa Division.

Aug. 25, 1971.

William M. James, Jr., Oscar Blasingame, Asst. U. S. Attys., Tampa, Fla., for plaintiff.

Paul J. Antinori, Jr., Tampa, Fla., for defendant.

## ORDER

KRENTZMAN, District Judge.

This cause came before the Court upon the following motions filed by the defendant:

1. Motion to dismiss the indictment.
2. Motion to compel disclosure of confidential informant.
3. Motion to suppress evidence.

Defendant is indicted for violation of Section 1202(a), Title 18, Appendix of the United States Code, to wit: being a previously convicted felon in possession of a firearm. This charge came about when Tampa police officers discovered a firearm at defendant's house while executing a warrant to search for stolen clothes.

A hearing was conducted at which time the court heard the testimony of the officers involved in this search and the argument of counsel upon the motions.

I

The Motion to Dismiss—Whether an essential element of the offense under the statute [1] is the involvement of the firearm in commerce.

The defendant contends that the indictment charging him with a violation of § 1202(a) should be dismissed as a matter of law because it fails to allege any involvement of the firearm in question in interstate commerce. Defendant contends such involvement in interstate commerce is a material element of the offense charged which must be alleged and proved. Defendant, in his motion relies upon United States v. Bass, 434 F.2d 1296 (2 Cir. 1970).

While it is true that *Bass* strongly supports defendant's view, the decision there is an isolated one which is presently being challenged in the United States Supreme Court, certiorari granted, March 29, 1971, 401 U.S. ——, 91 S.Ct. 1234, 28 L.Ed.2d 530. The other courts before which the issue has been heard have decided contrary to *Bass, e. g.,* United States v. Daniels, 431 F.2d 697 (9 Cir. 1970); United States v. Cabbler, 429 F.2d 577 (4 Cir. 1970).

██ Moreover, this Court has previously held that proof of possession of

---

1. Title 18 U.S.C., Appendix, § 1202(a) reads, in part, as follows: "Any person who—(1) has been convinced by a court of the United States or of a state or any political subdivision thereof of a felony * * * and who receives, possesses, or transports in commerce or affecting commerce * * * any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both."

the firearm in commerce is not an essential element of the offense. United States v. Coryell, No. 70–232 Cr.T. (Middle Dist. of Fla., Tampa Div. Order Feb. 18, 1971). The Court adhers to its previous ruling and denies defendant's motion to dismiss.

## II

Whether the United States Government should be compelled to disclose the identities of the confidential informants upon whose information the search warrant was based.

The firearm which forms the basis of this charge was discovered by police officers while executing a warrant to search for certain stolen goods in the home of Johnny Tranquillo. The warrant was issued on the authority of an affidavit signed by Detective Richard L. Cloud of the Tampa Police Department. Much of the information upon which Detective Cloud relied in his affidavit came from two confidential informants who had previously proved themselves to be reliable to the detective.

The defendant moves for the disclosure of these informants for the stated purpose of testing the veracity of Detective Cloud in executing the affidavit and, consequently, the probable cause supporting the issuance of the warrant. Defendant does not contend that the four corners of the affidavit fail to show probable cause under the guidelines of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

■■ The general rule is that disclosure of a confidential informant is not required when the sole purpose to be served by such disclosure is to attack the probable cause supporting a search warrant. Lopez v. United States, 370 F.2d 8 (5 Cir. 1966). Moreover, a request for informants' names in an attack upon the affidavit supporting a search warrant is not, standing alone, sufficient to require disclosure. Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964). The defendant asserts no other grounds for

disclosure or limitations upon the informant's privilege to remain undisclosed such as those described in Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Consequently, defendant's motion to compel disclosure is denied.

## III

### Motion to Suppress

A. Whether the property sought to be seized pursuant to the search warrant was described with sufficient particularity to withstand the requirements of the Fourth Amendment.

The search warrant issued here described the articles sought to be seized as "suits of clothing and shoes stolen from Eggner-Diaz Clothing Store." Attached to the warrant was the detective's affidavit which was referred to in the warrant as "attached Exhibit A which is hereby incorporated by reference and made a part hereof." This affidavit described the suits by brand name. The defendant contends such description was not sufficient to meet the requirement of the Fourth Amendment that articles sought to be seized must be particularly described. The defendant's contention is without merit. The articles were described generically in the warrant proper, i. e. suits and shoes. The suits were described by brand name in the affidavit. Since there is no question that this affidavit was attached to the warrant at the time of execution, the warrant and attachment constitute one complete document and the affidavit may therefore be relied upon to satisfy the description requirements of the Fourth Amendment. United States v. Brooks, 303 F.2d 851 (6 Cir. 1962), cert. den. 371 U.S. 889, 83 S.Ct. 184, 9 L.Ed. 2d 122; see also Clay v. United States, 246 F.2d 298 (5 Cir. 1957).

■ When considering the sufficiency of a description in a warrant, the nature of the articles must be taken into consideration. In the language of James

v. United States, 416 F.2d 467, 473 (5 Cir. 1969):

> "When circumstances make an exact description of instrumentalities a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking."

Here, the description of the articles in a generic sense and, also, description by brand names where possible was sufficient to satisfy constitutional requirements.

> B. Whether the circumstances and events involved in the execution of the search warrant caused the search to be one of a general exploratory nature in violation of the defendant's rights under the United States Constitution.

Defendant contends that although this search was executed pursuant to a warrant, the manner of the execution caused the search to become one of a general exploratory violation of the Fourth Amendment.

In support of his contention the defendant points out the following facts. Shortly before Detectives Cloud and Woolweaver were to execute this search warrant they went to a local diner where they met, apparently by chance, two vice squad detectives. Cloud and Woolweaver told the vice squad detectives of the search they were about to make and invited them to "drop by." These vice squad agents did "drop by" and without a warrant or consent of the defendant they conducted an extensive search of the entire house for narcotics.

As previously stated, the warrant authorized a search only for suits and shoes believed to be stolen from a local clothing store. It made no mention, either in the warrant or affidavit of narcotics. Nevertheless, these vice squad detectives were invited along to look for narcotics. In addition, Detective Woolweaver admits that he and Cloud had their "eyes open for narcotics."

During their search Detectives Cloud and Woolweaver did find approximately thirty suits and twenty pairs of shoes which appeared to them to be new. However, the suits had no manufacturers' labels in them and, therefore, the officers say they continued their search, this time looking for the labels. These labels were never found, but it was in the search for them that Detective Woolweaver says he discovered a 38 calibre pistol in the drawer of a night-stand in one of the bedrooms. This pistol forms the evidentiary basis of the charge against the defendant and is now sought to be suppressed.

The Fourth Amendment declares that the right to be secured from unreasonable searches and seizures shall not be violated and, in addition, that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." It is clear that the amendment is particularly aimed at prohibiting the general search which had become common in the colonies prior to the American Revolution. Writing for the Supreme Court on this point, Mr. Justice Bradley said in Boyd v. United States, 116 U.S. 616, at 624, 6 S.Ct. 524, 529, 29 L.Ed. 746 (1886):

> "In order to ascertain the nature of the proceedings intended by the fourth amendment to the constitution under the terms 'unreasonable searches and seizures,' it is only necessary to recall the contemporary or then recent history of the controversies on the subject, both in this country and in England. The practice had obtained in the colonies of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods, which James Otis pronounced 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book;' since they placed 'the liberty of every man in the hands of every petty officer.'"

The Fourth Amendment was designed to remedy this situation by interposing

the cool objective judgment of the magistrate between the police officer and the citizen. McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). The effect of the amendment was articulated in the famous dictum of Marron v. United States, 275 U.S. 192, at 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927):

> * * * "[T]he requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."

However, the doctrine enunciated in *Marron* suffered from overstatement. If it were to be applied literally, there could never be a valid seizure of anything not described in a search warrant. For this reason, "the *Marron* doctrine has generally not prevailed *when the search and seizure was considered reasonable under all of the circumstances.*" (Emphasis supplied.) Gurleski v. United States, 405 F.2d 253, 257 (5 Cir. 1968).

One of the areas in which *Marron* would not be strictly applied was formulated in the case of Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947) where it was written at page 155, 67 S.Ct. at page 1103:

> "If entry upon the premises be authorized and the search which follows be valid, there is nothing in the Fourth Amendment which inhibits the seizure by law-enforcement agents of. * * property, the possession of which is a crime, even though the officers are not aware that such property is on the premises when the search is initiated."

While *Harris* involved government property illegally possessed and also dealt with the particular case of a search incident to an arrest, the same reasoning has been held to apply with equal force to non-governmental properties and searches made under the authority of a search warrant. *Gurleski, supra,* 405 F.2d at 258. It is noteworthy that even this limitation upon the Fourth Amendment became law only by the barest of majorities. Four of the justices dissented bitterly. Recently, the *Harris* decision has been overruled, in part by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 2043, 23 L.Ed.2d 685 (1969). Mr. Justice Stewart, speaking for the Court in holding as illegal a search of defendant Chimel's house incident to his arrest stated:

> "*Rabinowitz* (United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653) and *Harris* have been the subject of critical commentary for many years, and have been relied upon less and less in our own decisions. It is time, for the reasons we have stated, to hold that on their own facts, and insofar as the principles they stand for are inconsistent with those that we have endorsed today, they are no longer to be followed."

This Court mentions the *Chimel* decision only to show that the reasoning of *Harris* is under attack. The holding in *Chimel* does not apparently over-rule that part of *Harris* quoted above, at least as it applies to searches executed under a search warrant.

Therefore, the usual rule would be that when Officer Woolweaver looked in the night-stand while "hunting for labels" from the suits and saw the pistol, he could properly seize it, having probable cause to believe that Tranquillo was a previously convicted felon and that his possession of the firearm would therefore be a crime.

However, the exception to *Marron* enunciated in *Harris* carried with it certain pre-requisites to its application. The search may not be a general exploration but must be specifically directed to the means and instrumentalities by which the crime charged had been committed and the agents *must have conducted their search in good faith for the purpose of discovering the objects specified in the warrant.* Moreover, nothing in the agents' conduct should be incon-

sistent with their declared purpose. The *Gurleski* case, *supra*, reiterated the necessity of these pre-requisites.

■ The thrust of the *Harris* exception is to allow the strict *Marron* doctrine to bend in order to comply with the practicalities of police work. However, the pre-requisites of the *Harris* rule must be strictly followed or else the Fourth Amendment would become a dead letter. As a warrant cannot authorize a general exploratory search by its own terms, Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965), neither can officers under the guise of *Harris* make any kind of search they wish merely because a warrant has opened the door. In the words of the Court in Gouled v. United States, 255 U.S. 298, 309, 41 S.Ct. 261, 65 L.Ed. 647 (1921), search warrants "may not be used as a means of gaining access to a man's house or office and papers solely for the purpose of making search to secure evidence to be used against him in a criminal or penal proceeding. * * * "

■ If the search is not conducted in good faith, then *Marron* must be strictly applied and, if anything, only those items specifically described in the warrant may be used as evidence against the defendant. Once there is evidence of lack of good faith on the part of the investigating officers, there is no standard by which a judge can ascertain whether the seized object was found while looking for the items described in the warrant or while conducting a general search for other items not described.

If the search in the instant case were otherwise legal, the acts of the Detectives Cloud and Woolweaver in searching for the missing labels was proper. The labels were a part of the suits described in the warrant and they were themselves described in the affidavit. Under those circumstances the finding of the gun while looking for the labels would be a legal act and the gun could be used against the defendant as evidence.

However, the Court finds as a matter of fact that by the time Woolweaver found the gun in the nightstand the search had gone so far astray of a search for the items mentioned in the warrant that it had become a general exploratory search for any evidence of wrongdoing that might be found.

■ All of the evidence before the court indicates this was not a "good faith search" as required by *Harris*. The act of Cloud and Woolweaver in inviting the two vice squad detectives along and the statement made by Woolweaver above that they were keeping their "eyes open for narcotics," indicates that their conduct was inconsistent with the lawful purpose of searching for stolen clothing. They were hunting for any evidence of wrongdoing they could find. This was evidenced by the candid remark of vice squad detective Rosselot that "personally, I was not really aware of what we were looking for," even though he also admits he was looking for narcotics. The search itself lasted approximately two hours with the four officers searching every room of the house looking in such places as medicine cabinets, refrigerators, drawers, etc.

Detective Cloud does state that he called the vice squad detectives a second time after he and Woolweaver had arrived at the Tranquillo residence. However, Cloud's testimony on this point is *confused and contradictory*. He states that he called the vice squad: 1) when he discovered some "unmarked pills" during the search; 2) when he first gained entry to the house and 3) when he first got out of his squad car. On the other hand, Officer Rosselott of the vice squad remembers the initial invitation to "drop by," but does not remember whether he received another call from Cloud after that.

■ Construing the conflicting testimony of Cloud most favorably to the government—that is, presuming that the vice squad agents were not called for the second time until the discovery of the

"unmarked pills"—it is still doubtful that such "exceptional circumstances" existed so as to allow the vice squad to make an unwarranted search for narcotics. United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951). The only possible proper course of action which could have been taken by Cloud upon finding the "unmarked pills" would have been to have seized them. It was not proper for Cloud to institute a full scale search of the house for narcotics upon finding the pills. Even the case of Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925) which expanded the authority of an officer to conduct a search incident to a lawful arrest stated at 33, 46 S.Ct. at 6:

"* * * belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause."

The general requirement that a search warrant be obtained "is not lightly to be dispensed with." *Chimel, supra*, 89 S. Ct. at 2039, 23 L.Ed.2d at 693. The burden is on those seeking an exemption from this requirement to show the need for it. United States v. Jeffers, *supra*. Here there is no attempt made to justify the illegal actions of the officers involved. The government's contention is merely that the actions of the vice squad agents should not illegalize the actions of the other officers. The facts are not that simple. This is not the case of two searches, one legal and one illegal. The vice squad detectives were not interlopers upon the authority of Officer Cloud. To the contrary, they joined with Officer Cloud to turn a single warranted search for particular items into a proscribed general search for wrongdoing.

The finding of a bottle of "unmarked pills" can hardly of itself establish probable cause for a warrant to issue, much less allow a police officer of his own volition to disobey the orders of his warrant and search for whatever he pleases. Moreover, the factual conflict resulting from contradictions in Cloud's own testimony must itself be resolved in favor of the defendant. Detective Rosselott admits that he went to the Tranquillo house not because of a call concerning pills that had been discovered, but because of the original invitation to "drop by" given at the diner. Detective Woolweaver says that the vice squad was invited along because, "We had our eyes open for narcotics." Thus, by the time the "unmarked pills" were discovered, the illegal nature of the search was a *fait accompli*.

It must follow that the rule in *Harris* has no application here because the essential prerequisites to that rule are not present. The search in the instant case was not a good faith search. The evidence shows that the acts of the searching officers were inconsistent with the lawful purpose of executing a warrant to search for stolen clothing, but rather such acts constituted an exploratory search in violation of the defendant's rights under the Constitution. Therefore, the use of the seized firearm as evidence against the defendant must be suppressed. The Court rules only upon the precise issue of whether an item not described in the search warrant could be used as evidence against the defendant under the facts of this case. Whether the instant search was so general in nature that it would have necessitated the suppression of the suits and shoes which were described is not before the Court. Those items were not seized. It is clear that the *Marron* decision and the cases which followed it require the application of a more stringent standard when the items seized are not mentioned in the warrant.