[Crim. No. 19245. First Dist., Div. Three. May 28, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
NATHANIEL McGRAW, Defendant and Appellant.

**COUNSEL**

Benjamin R. Winslow and Winslow & Schmidt for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney

General, W. Eric Collins and David D. Salmon, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**WHITE, P. J.**—Defendant and appellant Nathaniel McGraw appeals from the judgment of the Superior Court of Alameda County entered after a jury found him guilty of burglary (Pen. Code, § 459) in case No. 66405, and possession of stolen property (Pen. Code, § 496) in case No. 66320, as amended, which had been consolidated for trial.

In case No. 66405 appellant was represented by retained counsel, Attorney Jerry Rossman. In case No. 66320 he was assigned Mr. Bloom, a public defender to assist in his defense. With the trial court's permission and appellant's consent and/or agreement, retained counsel did not assist or participate in the selection of the jury. Mr. Bloom selected the jury in his capacity as attorney in case No. 66320. We hold that as a consequence appellant did not receive a fair trial in case No. 66405.

What retained counsel characterized as "minimal" representation, this court holds to be a denial of appellant's constitutional right to assistance of counsel, reversible error per se. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) Unless waived, a criminal defendant is entitled to the assistance of a competent, active and diligent attorney during jury impanelment. (See *People* v. *Locklar* (1978) 84 Cal.App.3d 224 [148 Cal.Rptr. 322].)

The People contend that the record demonstrates that Mr. Bloom "in fact substituted" for Mr. Rossman during jury selection. The People's contention is without merit. Further, appellant's asserted consent to and apparent approval of Mr. Rossman's "minimal" representation in case No. 66405 did not meet even the minimal constitutional requisites for a valid waiver of the right to counsel. (See *In re Johnson* (1965) 62 Cal.2d 325 [42 Cal.Rptr. 228, 398 P.2d 420].)

Additional issues raised by appellant's brief are argued at length by the parties in case No. 66405. In view of our decision to reverse the judgment on grounds of denial of counsel, we find no reason to discuss and resolve issues of *Pope* error (*People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859]), *Griffin* error (*Griffin* v. *California*

(1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]) and *Glasser* error (*Glasser* v. *United States* (1942) 315 U.S. 60 [86 L.Ed. 680, 62 S.Ct. 457]).

■ In the appeal of case No. 66320, as amended, we determine that the ruling denying appellant's pretrial Penal Code section 1538.5 motion to suppress evidence was not in error. Appellant essentially contends that the police seizure of personal property on March 24, 1978, from appellant's residence was not in good faith and impermissibly exploratory. (*United States* v. *Tranquillo* (M.D.Fla. 1971) 330 F.Supp. 871.)

The trial court in our view correctly found a *Skelton* search. (*Skelton* v. *Superior Court* (1969) 1 Cal.3d 144 [81 Cal.Rptr. 613, 460 P.2d 485].) The substantial evidence supports the finding that the entire search of appellant's premises was not exploratory but in good faith. Accordingly, we affirm the judgment in case No. 66320.

On January 20, 1978, while on patrol in the Piedmont area, Officer Randolph Souza of the Piedmont Police Department received a police radio communication. He was given a description of a vehicle and driver that had been spotted in his area.

Souza headed toward the intersection of Alta and Blair, the location he had been given, and saw a 1973 Oldsmobile which matched the description he had received. Upon spotting the car, Souza turned his car around to follow and activated his siren and lights. At the sound of the siren the Oldsmobile increased its speed; Souza chased the vehicle through a residential neighborhood for approximately one-half mile. When finally halted, after attaining speeds approaching 50 miles per hour, "running" 4 stop signs and passing traffic on the wrong side of the road, appellant was ordered by Officer Souza several times to get out of his vehicle, but he did not comply. Officer Souza then approached the driver's side with weapon drawn and yelled at appellant to put his hands up and get out. With Officer Ronald Stroshine providing cover, Officer Souza opened the driver's door and pulled appellant from the car. At some stage he was asked to identify himself and the owner of the car. Appellant made no reply except to say, "I want my attorney."

Appellant was forcibly placed in a prone position, handcuffed, and given a pat-down search by Officer Souza. Visible in appellant's right jacket pocket was a pair of surgical gloves. When Officer Souza pulled

them from his pocket, a yellow metal watch which had been wrapped inside them fell out. Officer Stroshine found a long screwdriver tucked inside appellant's sock.

Stroshine also conducted a search of the vehicle. This search produced ignition keys, a second screwdriver, $220 in United States currency (one $100 bill and six $20 bills), and Y69,000 in Japanese currency (six Y10,000 notes and nine Y1,000 notes).

After appellant was transported and placed in custody, the police were notified that on this same day, a burglary had been committed at the Kim residence, 634 Blair Avenue, Piedmont, while the Kims were away. Among the items missing was a lady's gold wristwatch, $220 in United States currency in denominations of one $100 and six $20 bills and Y69,000 in denominations of one Y10,000 bill and nine Y1,000 bills. Appellant was subsequently charged with the burglary of the Kim residence, or alternatively, possession of stolen property (information No. 66405). On these charges, he retained Attorney Rossman to assist in his defense. Apparently, appellant was released on bail.

On March 22, 1978, a burglary and robbery took place at the Oakland residence of Glen Carl Rich. The police treated appellant as their prime suspect, using his picture in a photo lineup. On the strength of an identification by Mr. Rich from the photo lineup, and later from a physical lineup, appellant was charged with the burglary and robbery of Glen Carl Rich (information No. 66283).

When reporting to the police on March 24, Mr. Rich gave a description of the clothing worn by the burglar. The police, on the strength of the photo lineup identification, prepared a search warrant for appellant's residence, 32 Moss, Oakland with authorization for night service. Appellant shared this residence with Robin Danette Strong, a codefendant until their cases were ordered severed. Sergeant Ned Ubben had been sent to watch the residence while the warrant was being obtained. Before it was issued, Sergeant Ubben arrested appellant. The warrant was issued to authorize a search for specific articles of clothing, $30 in United States currency, a legal-sized yellow pad, and indicia of residency as to 32 Moss. Following this fruitful search, appellant was charged with the felonious possession of stolen property (information No. 66320). Thereafter, appellant appears to have been indigent. He was unable to retain counsel or post bail. The public defender was ap-

pointed to represent McGraw on case Nos. 66283 and 66320 which in time was consolidated with case No. 66405.

At trial, Mr. Teng-Chung Wu identified 26 silver coins in brown wrapping paper and tied with ribbon, found in the search of 32 Moss as ones that had been taken from his home in February.

Ms. Fanny Chiu had been the victim of a burglary of her residence, 15 Lake, on December 2, 1977. She identified as hers a red pouch, a blue pouch and the contents of both. These items had been seized from Ms. Strong's room at appellant's residence during the search of March 24.

Based on this evidence, appellant was convicted of the burglary of the Kim residence (information No. 66405) and of the knowing possession of stolen property (information 66320). He was acquitted of both counts in case No. 66283 (i.e., the Glen Rich case).

### Case No. 66405

Trial commenced on June 28, 1978. Counsel of record was not present. The following colloquy between the court, counsel and appellant explains his absence. "THE COURT: The matter of the People versus Nathaniel McGraw.

"MR. BLOOM: Ready for Mr. McGraw.

"MR. CUMMINGS: People are ready, Your Honor.

"MR. BLOOM: At this time before we proceed further I would like the record to reflect that my name is Howard Bloom of the Public Defender's Office. I represent Mr. McGraw in Action No. 66283 and 66320 which have been consolidated. It is my understanding that there is a third matter which was also consolidated for this trial in which I do not represent Mr. McGraw. I will not be representing his interest in those two counts, although I believe I will be selecting the jury.

"THE COURT: All right. Mr. McGraw, we have three matters pending before this Court at this time in which you are named as a defendant. As Mr. Bloom has indicated, in Action No. 66283 in which you are charged with one count of burglary and one count of robbery with the use of a deadly weapon allegation as to each count, those events alleged

to have occurred on March 22nd and Mr. Bloom represents you. In 66320 the case in which Robin Danette Strong was also a defendant, but she has been severed, and in which you are charged with one count of receiving in violation of Section 496 of the Penal Code and one burglary count. Mr. Bloom also represents you. You also have pending before this Court No. 66405 in which you are charged with one burglary and one count of receiving or possession of stolen property on January 20, 1978. As to those matters Mr. Jerry Rossman represents you. Mr. Rossman was present yesterday when we had some informal discussion about these matters. He has indicated to me that it is his intention to be personally present in court only during those portions of the trial which related directly to the one case in which he represents you. He has told me that he has discussed this with you and that actually you had signed a release releasing him from representing you in the case. But that was not permitted by the Court because of the timing of it. He has indicated to me that you would agree in open court that he need not be present during the jury selection and that the entire jury selection on your behalf would be done by Mr. Bloom, is that correct?

"THE DEFENDANT: Yes, sir.

"THE COURT: And you so agree, is that right?

"THE DEFENDANT: Yes, sir.

"THE COURT: He has also indicated to me that he would not be present this morning because it is our intention to take up a motion which relates to a case other than the one on which Mr. Rossman represents you. He has discussed that with you?

"THE DEFENDANT: Yes, sir.

"THE COURT: And you have agreed to his not being here, is that right?

"THE DEFENDANT: Yes.

"THE COURT: Then we will proceed this morning in the absence of Mr. Rossman.

"It is my understanding, Mr. Bloom, that there is a preliminary motion which you wish to have heard at this time."

After a one-half day hearing on Mr. Bloom's motion (Evid. Code, § 403) jury selection consumed the balance of the day and all of the following day, June 29, 1978. Proceedings then were recessed until July 5, 1978. Jurors and alternates were sworn at the end of the morning court session. Attorney Rossman made his first appearance and was introduced to the jury on July 6, 1978. The jury did not see him on July 10, 1978, the second day of testimony. However, on the second day out of the jury's presence, appellant alerted the court that he was desirous of making a motion to suppress the evidence in the Kim burglary (Pen. Code, § 1538.5). We quote the record at this point: "MR. BLOOM: Now Mr. McGraw has a motion to make which I don't feel would be proper for me to be involved in, since it involves Mr. Rossman's two counts. But I think that Mr. McGraw should be heard as far as that motion.

"THE COURT: Oh, no. Wait just a moment. It may be that Mr. Rossman is going to have to be here, but I don't want him to proceed in pro per on something that he is represented by counsel on.

"MR. BLOOM: Well, it's something that Mr. Rossman could not make for him. Unfortunately, Mr. Rossman did not make the motion for him.

"THE COURT: Let me at least hear what it is. I'm not saying that I will entertain it at this time, but I have no idea what kind of motion you want to make, Mr. McGraw.

"MR. BLOOM: That's fine.

"THE DEFENDANT: Yes. I would like to make a motion for a 1538.5, your Honor, in my case with Mr. Rossman. I feel like the reason for him not making that motion was because I paid him only presently to take me up to the Superior Court level. And by me being in jail, you know, I'm unable to pay him.

"THE COURT: Let me do this. I will not entertain that motion unless it is made by your counsel. You are represented by counsel on that matter and it is with your consent that he is not here through certain portions of the trial. But since you are represented by counsel, if that motion is to be made it only should be made by him and then we can deal with it at that time. So, I'm neither granting it or denying it, just indicating to you that I will not entertain that motion made by you in your own behalf when you are represented by counsel in a case.

"MR. BLOOM: I know you will cross the bridge when you come to it, your Honor, but it is very possible Mr. Rossman will not make that motion. Because as Mr. McGraw stated, he feels that he wasn't paid to do any of the work in Superior Court on this case. So, it is possible Mr. Rossman won't make that motion for Mr. McGraw.

"THE COURT: I have made my statement on that. I will entertain the motion if and when it is made by him. Is there anything else?

"MR. BLOOM: No. I am ready to proceed.

"THE COURT: All right. Would you get the jury, please."

Notified by the court's clerk, Mr. Rossman appeared on Tuesday, July 11, 1978. The People had completed the presentation of the entire evidence subject to the trial court's rulings on admissibility into evidence of several exhibits. Mr. Rossman informed the court he had decided that no formal objections would be lodged. As regards the 1538.5 motion, he opined: "I don't think that there is any merit which would justify that that motion be made. However, I think that he has a right that the record reflect he is desirous of that."

After the court admitted the Kim burglarized items into evidence, Mr. Rossman having previously waived opening statement, then rested. The record is silent as to whether he remained in court the balance of the morning; but it is clear that he was not present in the afternoon session during which the public defender completed his defense in case No. 66320. The prosecution offered no rebuttal. Consequently Attorney Rossman was not present at the jury instructions settlement conference held after the completion of testimony. Before absenting himself, however, he acknowledged that "there is some dispute as to whether that [his decision to lodge no formal objections] is proper given the entire case and his effective representation in the entire case," and later volunteered the following explanation: "MR. ROSSMAN: Your Honor, I think that the record should reflect—I think you have adequately described the situation. There is one other quirk to the situation, and that is this: My representing Mr. McGraw throughout these proceedings has been minimal, as the Court knows. When the case first proceeded I was retained simply on this one, 66405, as it began in Municipal Court. I was unaware of any other cases pending or that would be proceeding against Mr. McGraw. Sometime later when the case arrived to the Superior Court it was my intention to in some fashion extricate myself from the

case either by way of public defender picking up the defense or simply withdrawing or substituting out. I should point out that there is an informal substitution of attorney form which had been executed by my client and to be filed with the Court. I think that either the formal ruling was that it wasn't timely or that the Public Defender in his discretion refused to accept the case based on its lateness. So, I don't think we can easily make a distinction. I am the attorney for him in a case on a 1538 motion. It is simply not appropriate. All I can say is that based upon my professional opinion and my involvement in this case to date the 1538.5 motion was not made. I am in no way prepared to make it at this time."

Again in answer to the clerk's motion, Attorney Rossman appeared on the morning of July 12, 1978. He remained long enough to approve the settled instructions, the jury's verdict forms, to commence his waiver of closing argument, and to receive the court's permission, with appellant's "consent" that he "absent himself" during closing arguments.

It appears from the record that thereafter Attorney Rossman made no further appearances in the entire proceedings, including sentencing.[1]

█ On the record presented, we find appellant's counsel's assessment inescapable: "Jerry Rossman was retained by appellant to represent him on charges contained in Information #66405. Due to appellant's then inability of immediate payment, Mr. Rossman attempted to withdraw as counsel the *day before trial* was scheduled to begin. This withdrawal was appropriately denied as untimely. Yet Mr. Rossman was absent from a majority of the proceedings, including voir dire, jury instruction and sentencing.

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .

". . . Although Rossman was not officially allowed to withdraw, he achieved his objective by his conduct. Appellant was left without *any* assistance from Mr. Rossman, effective or otherwise."

---

[1]Sentencing (pronouncement of judgment) is a critical stage in the criminal proceeding during which a criminal defendant has the constitutional right to appear in person, and to be represented by effective counsel and to present evidence with respect to mitigation of sentence. (*In re Cortez* (1971) 6 Cal.3d 78, 88 [98 Cal.Rptr. 307, 490 P.2d 819]; *In re Perez* (1966) 65 Cal.2d 224, 229-230 [53 Cal.Rptr. 414, 418 P.2d 6]; *People v. Cropper* (1979) 89 Cal.App.3d 716, 719-720 [152 Cal.Rptr. 555]; *People v. Alexander* (1977) 74 Cal.App.3d 20, 26 [141 Cal.Rptr. 262].)

Any factual distinction between appellant's case at bench and *People v. Locklar, supra,* 84 Cal.App.3d 224, is essentially without a difference. In both instances defendants were convicted by a jury that was selected without any attorney acting in their behalf. In *Locklar,* assigned counsel, although physically present, refused to question jurors or exercise any challenges. Mr. Rossman did not even appear pro forma. The results are identical, i.e., defense counsel assumed "a position inconsistent with providing an effective defense," operating to deprive appellant of assistance of counsel, reversible error per se. (*Locklar, supra,* at p. 229.) Further, we hold as in *Locklar,* at page 229, that by reason of Attorney Rossman's calculated failure to participate in the jury selection, appellant, under the circumstances, was deprived of a fair jury.

We find no merit to the People's arguments seeking to avoid the result we reach herein. It is noteworthy that respondent equivocates and does not directly respond to appellant's assertion that he was denied his constitutional right to the assistance of counsel. We do appreciate, however, respondent's sense of frustration in stating, "we have found no case with facts quite like those here, . . ." Respondent's assessment of this record is that the public defender in fact substituted for Mr. Rossman with regard to most of these functions.[2] Further, respondent suggests that because appellant (1) knew that he would probably *lose* case No. 66405, (2) agreed to Rossman's absences and *approved* his handling of the case (with the exception of the section 1538.5 motion) and (3) because the trial court in three instances withheld rulings on objections until Mr. Rossman was summoned to be present, appellant's *rights* were protected.

In fact or otherwise, the public defender cannot be viewed as acting as substituted counsel in case No. 66405. The record (a part of which we have hereinabove quoted) speaks to the contrary. The public defender refused Mr. Rossman's belated attempt to effectuate a substitution. Attorney Bloom left no area for doubt as to his view. He advised appellant to appeal his conviction in case No. 66405, stating: "Another issue

---

[2]Respondent's brief lists as these functions that Mr. Rossman was retained to perform: "The public defender selected the jury, cross-examined three of the four prosecution witnesses without notable gain therefrom, attempted to object to certain exhibits, approved a paraphrased instruction the court gave during its re-reading of instructions relating to Case No. 66405, waived polling of the jury, argued the question of bail, entered the time waiver as to sentencing, argued in mitigation of sentence in Case No. 66405, and advised appellant of his appeal rights, prepared the necessary form, and stated probable grounds."

in Action 66405 is incompetence of your attorney to not be here on numerous critical and special parts of the proceedings against you."

Indeed, if the public defender had substituted in case No. 66405 under the circumstances shown, appellant would nevertheless have been denied his right to the assistance of counsel. There is nothing in the record to suggest that Attorney Bloom had investigated and was prepared to render effective assistance of counsel in case No. 66405. "An appointment of counsel without opportunity to confer with the accused and to prepare his defense could convert the appointment into a sham and a mere formality which would not satisfy the constitutional guarantee." (*People v. Avilez* (1948) 86 Cal.App.2d 289, 294 [194 P.2d 829].)

Appellant entered a plea of "not guilty" in case No. 66405. The fact, if it be a fact, that he knew he would likely lose is irrelevant to our inquiry. ■ "A defendant who pleads not guilty manifests his desire to contest the issue by every means lawfully at his disposal, and it is the duty of his counsel to assist him in this endeavor by the preparation and presentation of his defense." (*People v. McDowell* (1968) 69 Cal.2d 737, 746 [73 Cal.Rptr. 1, 447 P.2d 97].) The constitutional right to counsel "secure[s] to the accused person all the benefits which may flow from the employment of counsel to conduct his defense [citation]" (*People v. Avilez, supra*, 86 Cal.App.2d 289, 294), therewith entitling him "to the effective and substantial aid of counsel at all stages of the proceeding" (*People v. Zammora* (1944) 66 Cal.App.2d 166, 235 [152 P.2d 180]); and "the constitutional right to counsel mandates diligent, substantial representation, not simply a pro forma appearance. [Citation.]" (*People v. Locklar, supra*, 84 Cal.App.3d 224, 229.)[3]

---

[3]See generally, American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function (Approved Draft, 1971) Selection of Jurors section 7.2 pages 261-262: "(a) The lawyer should prepare himself prior to trial to discharge effectively his function in the selection of the jury, including the raising of any appropriate issues concerning the method by which the jury panel was selected, and the exercise of both challenges for cause and peremptory challenges.
"*Commentary*
"a. Preparation for jury selection
"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .
"... [T]he selection of a jury is an important phase of the trial and its unfolding is often beyond the comprehension of the lay client and the prospective jurors. The process requires the alert attention of the lawyer. As elsewhere in the trial, in the selection of the jury the advocate's decisions must be made under time pressure; they can be made wisely only if the lawyer has prepared himself adequately before trial. The lawyer should consider whether his case is an appropriate one to raise objections to the jury selection mechanism as it operates in the particular jurisdiction. Cf. United States

Respondent's brief concedes that "a question of waiver of right to counsel is not presented." Respondent's argument is that appellant's agreement on the record indicates "approval" or at least acquiescence in the "handling of the defense" and concurrence in the decision that "only a limited defense was appropriate in Case No. 66405."

Counsel on appeal argues as regards appellant's agreement that "[i]f any waiver took place, it was literally a waiver of presence by counsel at trial. However, how can this be distinguished from the general right to counsel? We submit that it cannot." This court is inclined to agree. However, we need not answer appellate counsel's question because "[i]n the case at bar there was not even minimal compliance with [the] constitutional requisites for a valid waiver ...." (See *In re Johnson, supra*, 62 Cal.2d 325, 337.)

■ The absence of a viable issue of waiver notwithstanding, we think it appropriate, in light of the record reviewed, to quote settled law: "To be sure, this right may be waived (*Johnson* v. *Zerbst*, 304 U.S. 458, 465 ...; *People* v. *Rocco*, 209 Cal. 68 ...), but 'a finding of waiver is not lightly to be made.' (*Moore* v. *Michigan*, 355 U.S. 155, 161 ....) 'It has been pointed out that "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights and that we "do not presume acquiescence in the loss of fundamental rights." A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.' (*Johnson* v. *Zerbst, supra*, 304 U.S. at p. 464 ....) These principles are 'equally applicable to asserted waivers of the right to counsel in state criminal proceedings.' (*Carnley* v. *Cochran*, 369 U.S. 506, 515 ....) Not only must the waiver be unqualified, but it may be made only by a defendant who has been apprised of his rights and who has 'an intelligent conception of the consequences of his act.' (*In re Tedford*, 31 Cal.2d 693, 695 ....)" (See *People* v. *Douglas* (1964) 61 Cal.2d 430, 434-435 [38 Cal.Rptr. 884, 392 P.2d 964].)

Stated otherwise, "the right to counsel may be waived, knowingly and intelligently, so long as the record establishes the defendant knew '"what he [was] doing and his choice [was] made with eyes open."'" (*Faretta* v. *California* (1975) 422 U.S. 806, 835 ....) If a defendant

---

*ex rel.* Goldsby v. Harpole, 263 F.2d 71 (5th Cir.), *cert. denied*, 361 U.S. 850 (1959). More frequently, counsel needs to prepare himself for the exercise of challenges for cause and peremptory challenges."

may waive entirely his right to counsel, certainly he may waive this right to a partial extent.... As with a complete waiver of counsel, a partial waiver must be knowingly and intelligently made, and the court must make such a finding on the record." (*People* v. *Miller* (1979) 89 Cal.App.3d Supp. 14, 16 [152 Cal.Rptr. 707].)[4]

### *Illegality of the Search (Case No. 66320, as Amended)*

Appellant objects to the ruling denying his motion to suppress evidence introduced in regard to information No. 66320, as amended. Appellant contends that the search of his residence was a general exploratory search resulting in the seizure of a number of items not listed in the warrant. Essentially he claims that it was improper for Officer Faulkner of the Piedmont Police Department to direct the seizure of such items as he was not there to execute the warrant, and the Oakland police officers would not have had probable cause to make the seizures had Officer Faulkner not been present.[5]

On March 24, 1978, Sergeant Calvin Young of the Oakland Police Department prepared an application for a search warrant based upon a statement by Glen Carl Rich which identified appellant as the perpetrator of a burglary, upon Officer Young's own affidavit, and upon a police report pertaining to the Rich burglary.

Sergeant Young was assisted by Sergeant William Gillespie. In the course of preparing the application for the search warrant, Sergeant Gillespie telephoned Officer Faulkner of the Piedmont Police Department to obtain information about appellant's residence. Faulkner had previously contributed information he obtained through his investigations to the production of a watch bulletin indicating appellant was a suspect in residential burglaries, and giving his alleged method of operation. Officer Gillespie also requested that Faulkner accompany him and Young for the execution of the search warrant. They made ar-

---

[4]See also *People* v. *Perez* (1979) 24 Cal.3d 133, 144 [155 Cal.Rptr. 176, 594 P.2d 1], holding that the consent to representation by a certified law student with licensed attorney present must be "read to require that any consent be knowingly and intelligently executed."

[5]We find no merit in appellant's contention that the facts here raise a *People* v. *Cook* (1978) 22 Cal.3d 67 [148 Cal.Rptr. 605, 583 P.2d 130], issue of intentional omissions of fact from a search warrant application which would vitiate a probable cause showing. The problem, however, really lies in whether the search was conducted in good faith.

rangements to meet at the Oakland Police Department at 11 p.m. that night.

Sergeant Gillespie testified that his purpose in requesting Faulkner's presence was to determine if any of the items of property found in that residence were the subject of burglaries which Faulkner was investigating.[6]

When he prepared his affidavit Sergeant Young was aware that appellant was suspected of other burglaries and of the information contained in the watch bulletin, but the affidavit did not include this information or any information pertaining to Officer Faulkner. The warrant was issued directing that it might be executed by any Alameda County peace officer.

When Faulkner arrived at the Oakland Police Department that night he discovered that the search party had left, and that McGraw had been arrested. Officer Gillespie was then radioed, and when he spoke with Faulkner he repeated his request for assistance. Gillespie testified "[Faulkner] had a little bit more knowledge of things that he was interested in . . . ."

At the suppression hearing Sergeant Young testified that he was aware Officer Faulkner had been contacted by Officer Gillespie and that Faulkner "had been invited to respond down to the Oakland Police Department to continue an exchange of information." He was not aware of any arrangement having been made whereby Officer Faulkner would accompany the search party. After the search had begun Young requested Faulkner's assistance to look at certain items already discovered which were believed to be stolen.

Once Faulkner arrived at the McGraw residence he directed the seizure of a number of items shown to him by the search party. Amongst the objects seized was a cellophane bag containing 26 antique Japanese coins in brown wrapping paper with a ribbon tied around it, a blue pouch containing various pieces of jewelry, a small red pouch containing a pendant, a glass cutting tool, and a rubber glove. The foreign antique coins were admitted at trial in support of information No.

---

[6]Officer Faulkner testified to the same effect. However, he could not specifically recall whether he was to accompany the Oakland police officers to execute a *Ramey* (*People v. Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333]) warrant or a search warrant.

66320, possession of stolen property, after the burglary victim identified the property as his.

■ The general rule concerning the permissible scope of a search conducted pursuant to a warrant is that "only the property described in the warrant may be seized." (*Skelton v. Superior Court, supra*, 1 Cal.3d 144, 155.) However, "[w]hen officers, in the course of a bona fide effort to execute a valid search warrant, discover articles which, although not included in the warrant, are reasonably identifiable as contraband, they may seize them whether they are initially in plain sight or come into plain sight subsequently, as a result of the officers' efforts." (*Id.*, at p. 157.)

The court in *People v. Hill* (1974) 12 Cal.3d 731 [117 Cal.Rptr. 393, 528 P.2d 1] (overruled on other grounds in *People v. DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5 [135 Cal.Rptr. 786, 558 P.2d 872]), narrowed the "plain sight" exception by fashioning a "nexus rule" to prevent officers from indiscriminately seizing items in the course of a valid search. Accordingly, police officers who seize an item must be aware of some specific and articulable fact from which a rational link between the item seized and criminal behavior can be inferred. "[P]ure speculation . . . will not suffice to establish the requisite nexus." (*Id.*, at p. 763.)

■ A further limitation on the plain view doctrine has been recognized which provides that a search under a warrant must be carried out in good faith.[7] (*United States v. Hare* (6th Cir. 1979) 589 F.2d 1291, 1296-1297; *United States v. Sanchez* (6th Cir. 1975) 509 F.2d 886, 889; *United States v. Tranquillo, supra*, 330 F.Supp. 871, 875; *State v. Kelsey* (Mo.App. 1979) 592 S.W.2d 509, 513; *State v. Watkins* (1975) 89 S.D. 661 [237 N.W.2d 14], overruled on other grounds in *State v. Kaseman* (S.D. 1978) 273 N.W.2d 716; see *People v. Blair* (1979) 25 Cal.3d 640, 657 [159 Cal.Rptr. 818, 602 P.2d 738]; 2 LaFave, Search and Seizure (1978) § 4.11(e), pp. 183-184.) "The search may not be a general exploration but must be specifically directed to the means and instrumentalities by which the crime charged had been committed and the agents *must have conducted their search in good faith for the purpose of discovering the objects specified in the warrant.* Moreover, nothing in the agents' conduct should be inconsistent with their declared purpose." (*United States v. Tranquillo, supra*, at pp. 875-876.)

---

[7]The good faith requirement is grounded in the Fourth Amendment. (*United States v. Sanchez, supra*, 509 F.2d 886, 889.) The Fourth Amendment took its origin in the

"... As a warrant cannot authorize a general exploratory search by its own terms, [citation], neither can officers ... make any kind of search they wish merely because a warrant has opened the door.... [S]earch warrants 'may not be used as a means of gaining access to a man's house or office and papers solely for the purpose of making search to secure evidence to be used against him ....'" (*Tranquillo, supra*, at p. 876.)

The search in *Tranquillo* was found not to be a good faith search. In that case two detectives obtained a search warrant authorizing a search only for shoes and suits believed to have been stolen from a local clothing store. Shortly before the execution of the warrant the detectives went to a local diner and by chance met two vice squad officers.

They told the officers of the search they were about to make and invited the vice squad officers to "drop by." The vice squad officers did "drop by," and they conducted an extensive search for narcotics. Notably, the two detectives also had their "eyes open for narcotics."

In the course of the search, the two detectives found a number of suits and shoes and a .38 caliber pistol. The pistol formed the evidentiary basis of the charge against the defendant and he sought to suppress it.

In granting defendant's motion the court found that the pistol would have been properly seized if the search had not been turned into a general exploration since the detectives had probable cause to believe the defendant was a convicted felon. However, the act of inviting the vice squad officers along on the search and the statement made that the detectives were also looking for narcotics "was inconsistent with the lawful purpose of searching for stolen clothing. They were hunting for any evidence of wrongdoing they could find." (*Id.*, at p. 876.)

In *State v. Watkins, supra*, 237 N.W.2d 14, a sheriff from one county pursuant to a search warrant went to the defendant's home to look for items taken from two burglaries. He was accompanied by other officers, one of whom was assigned to the narcotics division of a different

---

determination of the framers that persons should be protected from unreasonable searches and seizures such as those permitted under the general warrants and writs of assistance prevalent in the American colonies. (*Weeks* v. *United States* (1914) 232 U.S. 383, 390 [58 L.Ed. 652, 654, 34 S.Ct. 341]; *Boyd* v. *United States* (1886) 116 U.S. 616, 624 [29 L.Ed. 746, 748-749, 6 S.Ct. 524].)

police department. During the search drugs and paraphernalia were found. At trial the narcotics agent testified that he had not seen the search warrant and did not know what it contained.

Since the narcotics officer was not aware of what items were being searched for, his search was not found to be directed in good faith toward finding the objects described in the search warrant. Hence the search was found exploratory and the cache suppressed.

The court ruled that the plain view doctrine was inapplicable. It reasoned that the doctrine *supplements* the prior justification for the intrusion; it does not cure the defects of an unlawful search.[8]

Appellant contends that the search of McGraw's residence was not conducted in "good faith." Appellant stresses that Sergeant Gillespie invited Officer Faulkner along to see if he could identify stolen items not listed in the warrant. Although Gillespie and Young had read the watch bulletin which named McGraw as the probable perpetrator of a number of burglaries in which Oriental coins and jewelry had been stolen, they knew that Faulkner had been actively investigating these cases and was better acquainted with the relevant police reports. Consequently, they both requested his assistance in identifying items, many of which they personally had no probable cause to seize. (*Nunes* v. *Superior Court* (1980) 100 Cal.App.3d 915, 926-933 [161 Cal.Rptr. 351].) Appellant argues that "Faulkner converted the search to an unreasonable, exploratory shopping trip."

It is clear that Faulkner was not on the premises to help execute the search warrant even though it authorized any Alameda police officer to conduct the search. In fact, Faulkner never even read the warrant.

---

[8]Also apposite is *United States* v. *Sanchez, supra*, 509 F.2d 886. There a Toledo police officer obtained a call from a reliable informant who claimed that heroin would be found at the defendant's home. After the officer got a warrant to search for heroin, the informant called again stating that explosives could also be found. The officer then called the alcohol, tobacco and firearms' bureau and asked for assistance. The warrant was served two hours later. A thorough search revealed 70 pounds of explosives which formed the basis of the charges. The court suppressed the explosives because the federal agents had sought to ignore the warrant requirement and to enter the premises with local officers who were conducting a search for unrelated property. While the court there noted that only the local police were authorized to execute the search warrant its holding seemed to rest on broader grounds. Specifically, because the federal agents were not on the premises to assist in a search for heroin their search was not conducted in good faith. (Cf. *United States* v. *Hare, supra*, 589 F.2d 1291, 1296-1297.)

■ ""A proceeding under section 1538.5 to suppress evidence is one in which a full hearing is held on the issues before the superior court *sitting as a finder of fact.*" [Citation.]' [Citation.] (Italics added.) In such a proceeding the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. ■ On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence." (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)

Mr. Zimmer, appellant's counsel at the suppression hearing argued at length his version of the evidence, i.e., that it demonstrated that two distinct searches were made, one by warrant specifically describing clothing worn and items taken in the Glen Rich robbery and a separate exploratory search for evidence of eighteen to twenty recent house burglaries. However, he did not prevail. The trial court denied the motion relying upon *Skelton* v. *Superior Court, supra,* 1 Cal.3d 144. *Skelton,* at page 159, in distinguishing *People* v. *Mills* (1957) 148 Cal.App.2d 392 [306 P.2d 1005] (a wholly exploratory search) states: "*Mills* did not involve a search which was at least partially motivated by a desire to find evidence material to the crime for which the arrest was made."

Obviously the superior court's implied finding that the officers (including Faulkner, the Piedmont officer) did not search appellant's premises on a pretext but in good faith is supported by substantial evidence. The warrant authorized an intensive search (not only the suspect's clothing, $30 in currency, but a yellow legal-sized pad and indicia of residency) of appellant's residence at 32 Moss.

The trial court impliedly found that the officers executing the warrant uncovered what they reasonably suspected as contraband. Substantial evidence supports this finding. Gillespie and Young were generally aware that appellant was a suspected house burglar. Both the unusual nature and location of the foreign coins (at the bottom of a clothing hamper) and distinctive wrapping sufficiently articulated a rational link between the seized items and an inference of criminal activity. The trial court impliedly found that Faulkner was summoned not to explore but to match contraband to specific offenses. That this finding is supported by substantial evidence is beyond dispute.

In the final analysis what is involved herein is a "realistic balancing of the requirements of effective law enforcement and the necessity to protect the privacy of the citizen from unwarranted governmental intrusion." (*Skelton* v. *Superior Court, supra*, 1 Cal.3d 144, 158.) We find that the superior court correctly applied the law to the facts. The evidence supports the finding that the officers intruded in order to uncover and seize the objects specified in the warrant. Their conduct, including that of Faulkner, was not inconsistent with their declared purpose. *United States* v. *Tranquillo, supra*, 330 F.Supp. 871, *United States* v. *Sanchez, supra*, 509 F.2d 886, and *State* v. *Watkins, supra*, 237 N.W.2d 14 are inapposite. We are unable to perceive any significant additional intrusion involved in Faulkner's presence and conduct at appellant's residence. (See *People* v. *Superior Court* (*Meyers*) (1979) 25 Cal.3d 67, 74 [157 Cal.Rptr. 716, 598 P.2d 877].) Finally the twofold purpose of the exclusionary rule, i.e., deterring unconstitutional police activity and relieving the courts from compelled participation in illegal police conduct, in our view, is not disserved by the result we reach.

Judgment in case No. 66405 is reversed. Judgment in case No. 66320 is affirmed.

Scott, J., and Feinberg, J., concurred.